**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**UNITED STATES OF AMERICA,**

        Plaintiff,

**v.**                                    **Criminal Action No. 3:19-CR-29
(GROH)**

**MICHAEL KENNEDY,**

        Defendant.

## UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Now comes the United States of America, by William J. Powell, United States Attorney for the Northern District of West Virginia, by Jarod J. Douglas, Assistant United States Attorney, and Department of Justice Trial Attorney Christine M. Siscaretti, and presents its Proposed Findings of Fact and Conclusions of Law.   As supported by the testimony and evidence adduced at trial, the government respectfully requests that this Court adopt these Proposed Findings of Fact and Conclusions of Law, and render a verdict of guilty.

## STATEMENT OF THE CASE

1.      On March 20, 2019, the Grand Jury for the Northern District of West Virginia filed an Indictment charging defendant MICHAEL KENNEDY with one count of Deprivation of Rights under Color of Law, in violation of 18 U.S.C. § 242.

2.      Specifically, the Indictment alleges that on or about November 19, 2018, in Berkeley County, West Virginia, within the Northern District of West Virginia, the defendant, while acting under color of law, physically assaulted J.H., a person known to the Grand Jury,

1

during his arrest, and thereby willfully deprived J.H. of the right, secured and protected by the Constitution and laws of the United States, to be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force by one acting under color of law.   Further, the Indictment charges that, as a result of the defendant's actions, J.H. suffered bodily injury.

## FINDINGS OF FACT

I.   *The Defendant's Background and Training*

3.      On November 19, 2018, the defendant was employed as a West Virginia state trooper.   Testimony of Ryan Kolb, p. 26, ll. 16 – 20, p. 28, ll. 12 – 16; Austin Ennis, p. 94, l. 21 – p. 95, l. 4; David Ritchie, p. 140, ll. 4 – 10; Derek Walker, p. 169, ll. 1 – 6, 19 – 22, p. 170, ll. 5 – 10; Government Exhibit 3 (Dashboard Camera Video from Cruiser of Berkeley County Sheriff's Office Deputy David Ritchie, November 18 – 19, 2018, Clip from 1:55 to 5:10); and Government Exhibit 8 (Dashboard Camera Video from Cruiser of Berkeley County Sheriff's Office Deputy Christopher Merson).

4.      Before becoming a state trooper, the defendant attended the West Virginia State Police Academy, a twenty-five week residential training program, from November 2011 through May 2012.   Testimony of David Lee, p. 64, ll. 10 – 15; p.65, l. 25.

5.      At the academy, the defendant received lessons on numerous topics, including criminal law, defensive tactics, police ethics, search and seizure, and the appropriate use of force by law enforcement officers.   Testimony of David Lee, p. 66, l. 24 – p. 67, l. 4.

6.      Academy trainers taught these lessons through a combination of methods, including lecture, written exams, skills testing, and simulations.   Testimony of Lee, p. 66, ll. 6 – 20; p. 67, ll. 18 – 24; p. 67, l. 25 – p. 68, l. 4.

7.     Specifically, the defendant was taught at the training academy that the Fourth Amendment covers the use of force during any seizure.   Testimony of David Lee, p. 70, ll. 9 – 12; Exhibit 6, p. 7.

8.     The defendant was also instructed at the academy that any force used during a seizure had to be objectively reasonable.   Testimony of David Lee, p. 70, l. 13 – p. 71, l. 2; Government Exhibit 6, p. 12.

9.     The defendant was instructed that he could be held liable under federal law if he used force that was unreasonable.   Testimony of David Lee, p. 73, ll. 9 – 22; Government Exhibit 6, p. 30.

10.     In determining what level of force was objectively reasonable under any given circumstances, the defendant was taught during his law enforcement training to weigh numerous factors, including: a subject's age; a subject's size and physical capabilities, particularly in comparison to an officer's size and physical capabilities; and the number of subjects in comparison to the number of officers. Testimony of David Lee, p. 76, l. 3 – p. 78, l. 13; Government Exhibit 6, p. 65.

11.     The defendant was advised during his law enforcement training that a subject who was particularly young could be less of a threat. Testimony of David Lee, p. 77, ll. 4 – 6.

12.     The defendant was also taught that, if multiple officers were involved in a situation, less force may be needed.   Testimony of David Lee, p. 78, ll. 8 – 9.

13.     The defendant was taught that, in determining whether force was reasonable, he should not make the decision to use force based on emotions such as anger.   Testimony of David Lee, p. 78, l. 19 – p. 79, l. 15.

14.     The defendant was instructed at the academy that, even if an officer were angry at a subject because that subject had attacked another officer, that anger was not relevant to the officer's analysis of whether force was reasonable and necessary in a given situation.   Testimony of David Lee, p. 79, ll. 17 – 20; Government Exhibit 6, p. 17.

15.     The defendant was instructed that a pain compliance technique is something that could be utilized to cause a subject to suffer pain in order to gain compliance.   These pain compliance techniques could include closed-fist strikes.   Testimony of David Lee, p. 71, ll. 8 – 24.

16.     At the police training academy, the defendant was taught that pain compliance techniques could be considered excessive force depending on the circumstances in which they were used.   Specifically, the defendant was taught that pain compliance techniques that were used before a subject posed any immediate threat to an officer could be considered excessive force. Testimony of David Lee, p. 71, l. 25 – p. 72, l. 19; Government Exhibit 6, p. 22.

17.     The defendant successfully completed his training at the West Virginia State Police Academy.   Testimony of David Lee, p. 79, l. 24 – p. 80, l. 3.

18.     Trooper Derek Walker participated in the same state police training academy session as the defendant.   Testimony of Derek Walker, p. 168, ll. 20 – 22.

II.     *The Events of November 19, 2018*

19.     At approximately midnight on November 19, 2018, the defendant was on-duty as a state trooper, in uniform, and responding to a radio run at a bar called Jack Rabbit's in Martinsburg. Testimony of Ryan Kolb, p. 26, ll. 16 – 20, p. 28, ll. 12 – 16; Austin Ennis, p. 94, l. 21 – p. 95, l. 4; David Ritchie, p. 140, ll. 4 – 10; Derek Walker, p. 169, ll. 1 – 6, 19 – 22, p. 170, ll. 5 – 10;

4

Government Exhibit 3 (Dashboard Camera Video from Cruiser of Berkeley County Sheriff's Office Deputy David Ritchie, November 18 – 19, 2018, Clip from 1:55 to 5:10).

20.    Other law enforcement officers, including State Trooper Derek Walker, and Berkeley County Sheriff's Deputies Ryan Kolb, Austin Ennis, David Ritchie, and Christopher Merson also responded to the radio call at Jack Rabbit's.   See id.

21.    Deputy Merson responded to Jack Rabbit's in a black Ford Taurus, which did not have a police light bar on top of it.   Testimony of Austin Ennis, p. 94, ll. 14 – 20; Derek Walker, p. 171, ll. 13 – 20.

22.    Deputy Merson's car was identified as a police vehicle in "ghost" lettering that was only visible when light hit it at a certain angle; if light was not shining on it, then the car appeared to be a plain black Ford Taurus.   Testimony of Derek Walker, p. 171, l. 21 – p. 172, l. 4.

23.    As Deputy Merson slowed his car on Route 11, in preparation to turn into the Jack Rabbit's parking lot, he was rear-ended by a silver car driven by sixteen-year-old J.H.   Testimony of Luther Edward Brown, p. 11, ll. 18 – 21; Ryan Kolb, p. 28, ll. 17 – 22; Derek Walker, p. 172, ll. 7 – 15; Government Exhibit 2, 0:00 – 0:02.

24.    Deputy Merson pulled off the road and activated the police lights that were inside his car.   Testimony of Derek Walker, p. 172, ll. 24 – 25; Government Exhibit 2, 0:02 – 0:15.

25.    The silver car then backed up, drove around Deputy Merson's vehicle, and took off at a high rate of speed down Route 11.   Testimony of Derek Walker, p. 173, ll. 1 – 6; Government Exhibit 2, 0:15 – 0:20.

26.    Deputy Merson began to pursue the civilian car in his vehicle, and was soon followed by Trooper Walker, Trooper Kennedy, Deputy Ennis, and Deputy Kolb.   Testimony of

Ryan Kolb, p. 29, ll. 4 – 8; Austin Ennis, p. 96, ll. 6 – 9; Derek Walker, p. 173, ll. 17 – 23; Government Exhibit 2, 0:20.

27.     The vehicular pursuit lasted approximately 90 seconds, ending when the civilian car, driven by J.H., spun out of control, hit a utility pole, and rolled, causing several explosions. Testimony of Derek Walker, p. 174, l. 21 – p. 175, l. 20; Government Exhibit 2, 0:20 – 1:50.

28.     As a result of the accident, J.H.'s silver car appeared "totaled" and "mangled." Testimony of Ryan Kolb, p. 31, ll. 15 – 16; Government Exhibit 8.

29.     Deputy Merson approached J.H.'s car first, followed by Trooper Walker. Testimony of Derek Walker, p. 184, l. 22 – p. 185, l. 11; Government Exhibit 8, 0:05 – 0:10 .

30.     Through the smoke coming from the wrecked car, Trooper Walker observed J.H. in the driver's seat, and saw that J.H. had no obvious injuries; was not moving; did not appear to have anything in his hands; and that J.H. was conscious and staring at Deputy Merson and Trooper Walker, but J.H. did not respond to the officers' commands.   Testimony of Derek Walker, p. 185, l. 24 – p. 187, l. 9.

31.     J.H. was sixteen years old at the time of the pursuit and accident, and was small in stature.   Testimony of Luther Edward Brown, p. 9, ll. 21 – 22, p. 11, ll. 18 – 21; Ryan Kolb, p. 31, ll. 20 – 22.

32.     Deputy Merson banged on the driver's side window repeatedly with his fist and baton, breaking the window.   Testimony of Derek Walker, p. 187, ll. 13 – 15; Government Exhibit 8, 0:19 – 0:24.

III.     *The Initial Takedown*

33.      Deputy Merson and Trooper Walker reached into the vehicle and grabbed J.H. The defendant arrived on the scene as Deputy Merson and Trooper Walker pulled J.H. through the broken driver's side window and took him to the ground.   Testimony of Derek Walker, p. 188, ll. 2 – 9; Government Exhibit 8, 0:19 – 0:24.

34.      Deputy Ennis arrived on scene when J.H. was lying, face-down, on the ground. Government Exhibit 8, 0:33.

35.      The officers gave J.H. orders to give up his hands, or words to that effect. Testimony of Austin Ennis, p. 104, ll. 6 – 22.

36.       Deputy Ennis knelt down by J.H.'s head; Deputy Merson knelt down on J.H.'s left side; Trooper Walker stayed on J.H.'s right side; and the defendant stood near J.H.'s legs. Testimony of Austin Ennis, p. 105, ll. 3 – 8, p. 107, ll. 24 – 25; Derek Walker, p. 189, ll. 20 – 25, p. 191, ll. 7 – 8; Government Exhibit 8, 0:40 – 0:44.

37.      As the four officers surrounded him, J.H. tensed his body up and tucked his hands underneath his body.   Testimony of Austin Ennis, p. 106, ll. 9 – 12, 19 – 24; Derek Walker, p. 189, ll. 3 – 4, p. 190, ll. 2 – 8.

38.      J.H. also covered his face with his hands at times, as if to protect himself. Government Exhibit 8, 0:34 – 0:44.

39.      At no time during the takedown did J.H. attempt to strike or attack the officers. Testimony of Austin Ennis, p. 106, ll. 19 – 22; Derek Walker, p. 190, ll. 9 – 13; Government Exhibit 8, 0:24 – 0:57.

40.     Deputy Ennis executed closed-hand strikes to J.H. in order to secure J.H.'s hand, which was still tucked under his body.   Testimony of Austin Ennis, p. 106, ll. 5 – 18, Government Exhibit 8, 0:40 – 0:44.

41.     Similarly, Trooper Walker focused on trying to get a hold of J.H.'s arm to put it behind his back and handcuff J.H.   Testimony of Derek Walker, p. 190, ll. 2 – 3, p. 191, ll. 2 – 3, Government Exhibit 8, 0:35 – 0:45.

42.     While Trooper Walker and Deputies Merson and Ennis focused on J.H.'s hands and head in order to handcuff J.H., the defendant drew back his right leg and forcefully kicked J.H.'s lower body.   The defendant drew his leg back and kicked J.H. at least two more times. Testimony of Derek Walker, p. 191, ll. 7 – 10; Government Exhibit 8, 0:40 – 0:44.

43.     The defendant then bent his right leg and stomped down on J.H.'s lower body at least two times.   Testimony of Derek Walker, p. 191, ll. 14 – 18; Government Exhibit 8, 0:44 – 0:46.

44.     Trooper Walker gained control of J.H.'s hands, and all of the other officers, including the defendant and Deputies Merson and Ennis stepped away from J.H.   Testimony of Derek Walker, p. 191, l. 19 – p. 192, l. 23; Government Exhibit 8, 0:57.

45.     At the time that the defendant and Deputies Merson and Ennis stepped away, J.H. was lying face-down on the ground, with his arms behind his back.   Trooper Walker had his hands on J.H.'s hands.   Testimony of Derek Walker, p. 191, l. 19 – p. 192, l. 23; Government Exhibit 8, 0:57.

46.     When Deputy Ennis stepped away, he thought that J.H. was under control. Testimony of Austin Ennis, p. 110, ll. 2 – 4.

8

47.     After Deputy Ennis stepped away from J.H., he did not use any other force against J.H.   Government Exhibit 8, 0:52 – 2:22.

48.     After Deputy Merson stepped away from J.H., he did not use any other force against J.H.   Government Exhibit 8, 0:52 – 2:22.

IV.     *The Handcuffing*

49.     When Deputy Merson stepped away from J.H., he began to complain to the other officers, including the defendant, about feeling pain in his back. Testimony of Austin Ennis, p. 108, l. 21 – p. 109, l. 7; David Ritchie, p. 152, ll. 12 – 18; Government Exhibit 8, 0:54 – 0:57.

50.     A fifth officer, Deputy David Ritchie, arrived on the scene, and he observed that the defendant and Deputies Ennis and Merson were walking away from J.H., who was lying face-down on the ground with his hands behind his back.   Based on his observations of J.H., Deputy Ritchie did not believe that his assistance with J.H. was needed.   Testimony of David Ritchie, p. 151, l. 25 – p. 152, l. 5; Government Exhibit 8, 0:58.

51.     After Deputy Merson complained about pain in his back, the defendant walked back over to J.H., who was still lying face-down on the ground with his hands behind his back while Trooper Walker had his hands on J.H.'s hands.   The defendant put his knee on J.H.'s back. Government Exhibit 8, 0:57 – 1:00.

52.     On the video, J.H. appeared at this point to have a laceration to the left side of his face, which was bleeding.   Government Exhibit 8, 1:04 – 1:05.

53.     As the defendant knelt on J.H., Trooper Walker had both of J.H.'s hands in his right hand and got his handcuffs out with his left hand. J.H. pulled his right hand out of Trooper Walker's grip.   Trooper Walker reached up, grabbed J.H.'s right hand, and pulled it back into

9

cuffing position.   J.H. continued to feel tense and moved his right arm again.   Testimony of

Derek Walker, p. 194, l. 12 – p. 195, l. 8; Government Exhibit 8, 0:57 – 1:07.

54.     After J.H. moved his right arm, the defendant leaned his hand on the right side of

J.H.'s face, pushing the left side of J.H.'s already injured, bleeding face into the ground, and then

forcefully struck J.H. five times with a closed fist about the upper back.   Government Exhibit 8,

1:05 – 1:12.

55.     Deputy Ennis saw the defendant striking J.H., and he walked back and stood next

to J.H. to see if the other officers needed his assistance.   Testimony of Austin Ennis, p. 111, l. 18

– p. 112, l. 8; Government Exhibit 8, 1:08 – 1:18.

56.     Deputy Ennis saw no resistance from J.H.   Deputy Ennis did not use force against

J.H.   While the defendant repeatedly punched J.H. in the back, Deputy Ennis saw no reason to

use force against J.H.   Testimony of Austin Ennis, p. 111, l. 21 – p. 112, l. 2; Government Exhibit

8, 1:08 – 1:18.

57.     J.H. then moved his arm, and the defendant reached back and gave J.H.'s arm to

Trooper Walker.   Trooper Walker continued to handcuff J.H.   Testimony of Derek Walker, p.

196, ll. 2 – 14; Government Exhibit 8, 1:12.

58.     While Trooper Walker had control of J.H.'s hands and was in the process of

handcuffing J.H., the defendant continued to push the left side of J.H.'s cut, bleeding face into the

ground.   The defendant then forcefully struck J.H. about the upper body with a closed fist three

more times.   Testimony of Derek Walker, p. 196, ll. 15 – 23; Government Exhibit 8, 1:14 – 1:17.

59.     Trooper Walker described these strikes as "compliance" strikes, meaning strikes

that were designed to deliver pain.   Testimony of Derek Walker, p. 206, ll. 9 – 16.

10

60.     Deputy Ennis was standing next to J.H. at the time of the defendant's last three closed-fist "compliance" strikes.   Deputy Ennis saw no reason for the defendant to strike J.H. Testimony of Austin Ennis, p. 112, ll. 2 – 5; Government Exhibit 8, 1:13 – 1:15.

61.     Deputy Ritchie was assisting Deputy Merson when he saw the defendant strike J.H. Deputy Ritchie saw a sudden movement from J.H., but otherwise saw no need to assist the officers with J.H. or to walk over to J.H. and the other officers.   Testimony of David Ritchie, p. 153, ll. 4 – 15; Government Exhibit 8, 1:13 – 1:15.

62.     Other than reaching up to grab J.H.'s right hand and handcuffing J.H., Trooper Walker used no other force against J.H. during the handcuffing process.   Government Exhibit 8, 0:54 – 1:19.

V.      *The Toss of J.H. While Handcuffed*

63.     After he handcuffed J.H., Trooper Walker went to stand J.H. up to put him in a police cruiser.   As Trooper Walker picked J.H. up, J.H. tensed and jerked.   Trooper Walker lost his balance and fell.   Testimony of Derek Walker, p. 197, ll. 7 – 11; Government Exhibit 8, 1:19 – 1:22.

64.     Trooper Walker turned and walked away from J.H. because he was upset. Testimony of Derek Walker, p. 199, ll. 13 – 15; Government Exhibit 8, 1:22 – 1:30.

65.     The defendant reached down and picked up the handcuffed J.H. by the front of his shirt, and spoke to him in a raised voice as he lifted J.H. off the ground, and held J.H.'s face close to his face.   Testimony of Austin Ennis, p. 113, l. 14 – p. 114, l. 6; Government Exhibit 8, 1:22 – 1:26.

66.     The defendant walked several steps while continuing to hold J.H. by the shirt,

11

lifting his feet off the ground and causing J.H.'s pants to fall around his ankles.   Government Exhibit 8, 1:26 – 1:28.

67.   Using both hands, the defendant then forcefully extended both arms and tossed J.H. down to the ground.   J.H., whose hands were cuffed behind him, landed flat on his back. Testimony of Austin Ennis, p. 115, ll. 8 – 10; Government Exhibit 8, 1:28 – 1:30.

68.   Deputy Ennis saw the defendant toss J.H. to the ground.   Deputy Ennis saw no reason for the defendant to toss J.H., and Ennis had never been trained to toss a handcuffed individual down on his back.   Testimony of Austin Ennis, p. 115, ll. 11 – 16, Government Exhibit 8, 1:28 – 1:30.

69.   Deputy Ennis looked at J.H. as he was lying on the ground and saw that he was not resisting or even moving.   Testimony of Austin Ennis, p. 116, ll. 17 – 22.   Government Exhibit 8, 1:31 – 1:32.

VI.   *The Strikes at the "Snow Bank"*

70.    The defendant decided to move J.H., and Deputy Ennis assisted him.   Testimony of Austin Ennis, p. 117, ll. 12 – 17; Government Exhibit 8, 2:07 – 2:14.

71.   As the defendant and Deputy Ennis moved J.H., the defendant said, "This is a good spot for him," and then dropped J.H. down on a snow bank on the side of Route 11.   Testimony of Austin Ennis, p. 117, ll. 17 – 24; Government Exhibit 4, 0:01 – 0:04.

72.   After dropping J.H., who was still handcuffed, on the snow bank, the defendant leaned down and pulled J.H.'s face up near his face.   While speaking to him in a loud, angry tone, the defendant told J.H., in sum and substance, that he could have hurt or paralyzed Deputy Merson. Testimony of Ryan Kolb, p. 39, ll. 1 – 3, p. 40, ll. 7 – 11; Austin Ennis, p. 120, ll. 9 – 22,

12

Government Exhibit 4.

73.     The defendant then hit J.H. in the face with an open hand multiple times. Testimony of Ryan Kolb, p. 40, ll. 17 – 24; Austin Ennis, p. 121, ll. 8 – 20; Government Exhibit 4.

74.     After seeing the defendant strike J.H. in the face multiple times, Deputy Kolb observed a drop of blood on the defendant's face.   The defendant did not have any cuts or injuries on his face.   J.H., however, had lacerations and was bleeding about his face.   Testimony of Ryan Kolb, p. 41, ll. 6 – 19; Government Exhibit 4, 8.

75.     Deputy Kolb had an unobstructed view as the defendant struck the victim in the face at the snow bank.   Deputy Kolb did not think that J.H. was a threat, and he saw no reason for the defendant to strike J.H.   Testimony of Ryan Kolb, p. 40, l. 25 – p. 41, l. 5.

76.     Deputy Kolb saw no reason to use force against J.H., and he did not use force against him.   Testimony of Ryan Kolb, p. 45, ll. 5 – 8.

77.     Deputy Ennis would not have used the level of force the defendant used against J.H. at the snow bank, and indeed, Deputy Ennis did not use any force against J.H. at the snow bank.   Testimony of Austin Ennis, p. 121, ll. 8 – 20, p. 122, ll. 19 – 22, p. 123, ll. 14 – 15.

78.     No other officer except the defendant used any force against J.H. at the snow bank. Testimony of Ryan Kolb, p. 44, l. 22 – p. 45, l. 4; Austin Ennis, p. 123, ll. 16 – 17.

79.     No other officer except the defendant used any force against J.H. after J.H. was handcuffed.   Testimony of Austin Ennis, p. 123, ll. 19 – 22.

VI.     _Medical Treatment of J.H._

80.     Paramedic Luther Edward Brown responded to the scene on November 19, 2018 and provided medical treatment to J.H.   Testimony of Luther Edward Brown, p. 8, ll. 18 – 22, p.

11, ll. 22 – 24.

81.     For purposes of medical treatment and diagnosis, J.H. informed Brown that he had

been in a car accident and that he had been tossed to the ground.   Testimony of Luther Edward

Brown, p. 9, l. 23 – p. 10, l. 15, p. 12, ll. 7 – 17.

82.     For purposes of medical treatment and diagnosis, J.H. told Brown that he had a

headache and he complained that his handcuffs were too tight.   Testimony of Luther Edward

Brown, p. 12, ll. 7 – 1 17.

83.     Brown also observed bleeding on J.H.'s face, and contusions on J.H.'s left hip and

elbow.   Testimony of Luther Edward Brown, p. 9, l. 25, 11, ll. 14 – 15.

   *VII.*     *Discovery of Videos*

84.     About a week later, Berkeley County Sheriff's Office Captain Wilbur Johnson, who

had thirty-five years of law enforcement experience, was working on his crash report, and he

obtained video from Deputy David Ritchie's car.   Testimony of Wilbur Johnson, p. 214, ll. 3 – 4,

p. 218, l. 18 – p. 219, l. 8.

85.     As he reviewed the Ritchie video (in evidence as Government Exhibit 3), Captain

Johnson thought that it appeared that the video depicted something on the ground that officers

were striking.   Testimony of Wilbur Johnson, p. 221, ll. 9 – 12.   Captain Johnson thought that it

looked like a big bag of garbage had been tossed to the ground, and something told him that it was

not right.   Testimony of Wilbur Johnson, p. 222, ll. 2 – 9.

86.     After making these observations, Captain Johnson paused the video and notified

the Sheriff.   Testimony of Wilbur Johnson, p. 221, ll. 13 – 20.

87.     Captain Johnson also obtained video from Deputy Merson's dashboard camera.

14

Upon watching the Merson video, Captain Johnson immediately stopped the video and notified the Sheriff because he needed to let his supervisor know what he was seeing.   Testimony of Wilbur Johnson, p. 223, ll. 5 – 13.

## CONCLUSIONS OF LAW

88.     In order for the Court to find the defendant guilty of Count One of the Indictment, the government must prove, beyond a reasonable doubt, that the defendant: 1) acted under color of law; 2) deprived the victim, J.H., of a right secured or protected by the Constitution or laws of the United States; and 3) acted willfully. 18 U.S.C. § 242; *United States v. Lanier*, 520 U.S. 259, 264 (1997) ("Section 242 is a Reconstruction Era civil rights statute making it criminal to act (1) willfully and (2) under color of law (3) to deprive a person of rights protected by the Constitution or laws of the United States.") (internal citations omitted); *Screws v. United States*, 325 U.S. 91 (1945) (identifying the elements of an 18 U.S.C. § 242 offense); *United States v. Cowden*, 882 F. 3d 464, 474 (4th Cir. 2018) ("To obtain a conviction for deprivation of rights under color of law in violation of 18 U.S.C. § 242, the government must show that the defendant (1) willfully (2) deprived another individual of a constitutional right (3) while acting under color of law") (internal citation omitted); *United States v. Mohr*, 318 F.3d 613, 618 – 19 (4th Cir. 2003) ("[T]o demonstrate a violation of § 242, the government had to establish, inter alia, that [the defendant] acted (1) willfully . . . (2) under color of law, (3) to deprive [the victim] of a right protected by the Constitution of the United States.") (internal quotation and citation omitted).

89.     In order for the Court to find the defendant guilty of a felony violation of 18 U.S.C. § 242, the government also must prove that J.H. suffered bodily injury as a result of the defendant's actions.   18 U.S.C. § 242; *United States v. Perkins*, 470 F.3d 150, 160 – 61 (4th Cir. 2006) ("To

be convicted of a felony under 18 U.S.C.A. § 242, the Government must prove that the defendant willfully subjected a person to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, and bodily injury resulted from such deprivation.") (internal quotation and citation omitted).   Pain alone is sufficient to establish this element.   *Perkins*, 470 F.3d at 161 ("Physical pain alone or any injury to the body, no matter how fleeting, suffices" to establish bodily injury.)

> I.   *Color of Law*

90.   The first element the government must prove with respect to Count One is that the defendant acted under color of law.   A person acts under color of law if he is an official or employee of a federal, state, or local government and he uses or abuses power he possesses because of his official position.   A government official, such as a state trooper, acts "under color of law" if he is performing his official duties, purporting to perform those duties, or giving the appearance of performing such official duties, even if he misuses or abuses his official authority by doing something the law forbids.   In other words, if a state trooper misuses the power, invested in him by the law, to deprive someone of his rights, his actions are taken under color of law.   Ruschky, *Pattern Jury Instructions for Federal Criminal Cases*, District of South Carolina § III (modified); *West v. Atkins*, 487 U.S. 42, 49 – 50 (1988) ("It is firmly established that a defendant . . . acts under color of state law when he abuses the position given to him by the State.   Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.") (internal citation omitted); *Griffin v. Maryland*, 378 U.S. 130, 135 (1964) ("If an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that . . . the particular action which he took was

16

not authorized by state law.") (internal citation omitted); *Screws v. United States*, 325 U.S. 91, 111 (1945) ("It is clear that under 'color' of law means under 'pretense' of law . . . . Acts of officers who undertake to perform their official duties are included whether they hew to the line of their authority or overstep it."); *Jennings v. University of North Carolina*, 482 F.3d 686, 701 (4th Cir. 2007) ("State employment is generally sufficient to render the defendant a state actor, and a defendant necessarily acts under color of state law when he abuses the position given to him by the State.") (internal quotations and citations omitted); *United States. v. Ramey*, 336 F.2d 512, 515 (4th Cir. 1964) ("Under 18 U.S.C. § 242, 'color of law' includes misuse of power possessed by virtue of State law and made possible only because the wrongdoer is clothed with authority of State law.") (internal citations omitted).

91.      Here, the defendant was representing West Virginia as a state trooper.  He was in uniform, on duty, and responding to a radio call when he joined the pursuit of J.H.   The evidence proves beyond a reasonable doubt that the defendant was acting under color of law that night. Testimony of Ryan Kolb, p. 26, ll. 16 – 20, p. 28, ll. 12 – 16; Austin Ennis, p. 94, l. 21 – p. 95, l. 4; David Ritchie, p. 140, ll. 4 – 10; Derek Walker, p. 169, ll. 1 – 6, 19 – 22, p. 170, ll. 5 – 10; Government Exhibit 3 (Dashboard Camera Video from Cruiser of Berkeley County Sheriff's Office Deputy David Ritchie, November 18 – 19, 2018, Clip from 1:55 to 5:10); and Government Exhibit 8 (Dashboard Camera Video from Cruiser of Berkeley County Sheriff's Office Deputy Christopher Merson).

II.      *The Deprivation of Right*

92.      In the case before this Court, the right at issue is J.H.'s right to be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force by

one acting under color of law.   Indictment. [Docket No. 3:19-CR-29.]

93.   The test for determining whether a use of force was reasonable is an objective one, meaning that the Court should consider all of the facts and circumstances from the point of view of an ordinary and reasonable officer in the same position as the defendant.   In determining the reasonableness or the unreasonableness of force used, the Court may consider, among other factors, the severity of the crime, if any, committed by J.H.; the extent, if any, to which J.H. posed an imminent threat to the safety of the defendant or to any other person; the extent, if any, to which J.H. was physically resisting arrest or attempting to flee at the time force was used; and the extent of injuries, if any, suffered by J.H.   18 U.S.C. § 242; *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (holding that "a use of force is contrary to the Fourth Amendment if it is excessive under objective standards of reasonableness"); *Graham v. Connor*, 490 U.S. 386, 393, 396 – 97 (1989) (explaining that the Fourth Amendment governs an arrestee's excessive force claim and holding that reasonableness must be judged from perspective of reasonable officer on the scene, and noting that "proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight"); *Hupp v. Cook*, 931 F.3d 307, 321 – 22 (4th Cir. 2019) (holding that, in analyzing a Fourth Amendment excessive force case "we ask whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.   In answering this question, we consider several factors, including the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight.   We also consider

18

the extent of the plaintiff's injuries.") (internal citations, quotations, and alterations omitted); *Henry v. Purnell*, 652 F.3d 524, 531 (4th Cir. 2011) (holding that the Fourth Amendment's prohibition on unreasonable seizures includes the right to be free of seizures effectuated by excessive force and that whether an officer has used excessive force should be analyzed under a standard of objective reasonableness) (internal quotations and citations omitted); *Schultz v. Braga*, 455 F.3d 470, 476 (4th Cir. 2006) (holding that Fourth Amendment claims should be analyzed under an objective reasonableness standard) (internal quotation and citation omitted).

94.     In determining the reasonableness or the unreasonableness of force used, the Court may consider that an officer may not use force solely to punish, retaliate against, or seek retribution against another person, and that force that is objectively reasonable at the beginning of an encounter may not be justified – even seconds later – if the objective justification for the initial use of force has been eliminated.   *Meyers v. Baltimore County, Md.*, 713 F.3d 723, 733 (4th Cir. 2013) (finding that "force justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.") (internal quotation and citation omitted); *United States v. Aguilar*, 242 Fed.Appx. 239, 243 (5th Cir. 2007) (affirming jury instruction in a use of force case that included instruction that officers "may not use force to punish, retaliate or seek retribution against a person who has been arrested.").

95.     In the case at issue, the Court need only find that the defendant engaged in one unreasonable use of force.   The government, however, has proven that the defendant engaged in four different uses of force that were each unreasonable.

19

96.     The government has proved that the defendant's use of force during the initial takedown of J.H. was unreasonable because it far exceeded the force that was reasonably necessary to subdue J.H. and place him under arrest.   Specifically, the defendant acted unreasonably when he repeatedly kicked and stomped on the small, sixteen-year-old J.H., while J.H. was lying face-down on the ground with his hands tucked underneath him and was surrounded by four law enforcement officers.

97.     No other officer kicked or stomped on J.H. during the initial takedown.

98.     The government has proved that the defendant engaged in another unreasonable use of force during the handcuffing of J.H. when he pushed J.H.'s already-injured face into the ground and forcefully struck J.H. eight times with a closed fist about the upper body.

99.     At the time the defendant struck J.H., J.H. was lying face-down on the ground, with his hands behind his back.   Trooper Walker had his hands on the teenager's hands, and Trooper Walker handcuffed J.H. without delivering any strikes to J.H. Trooper Walker did not identify a reason to strike J.H. at that point in time.

100.    Deputy Ennis saw the defendant begin to strike J.H., and he approached J.H. to see if his assistance was needed.   Deputy Ennis saw no resistance from J.H. at the time that the defendant was striking J.H., and he saw no reason for the defendant to strike J.H.   Deputy Ennis did not use any force against J.H. during the handcuffing process.

101.    The government also proved beyond a reasonable doubt that the defendant engaged in another unreasonable use of force against J.H. when he picked the sixteen-year-old up by the shirt, lifted him off the ground, and forcefully tossed him with both hands.   J.H. landed on his

back, on top of his tightly handcuffed hands.   No officer offered a justification for this use of force.[1]

102.    As seen on Government Exhibit 8, J.H. was not a physical threat to the defendant or any other officer at the time of the toss.   J.H. was not a threat to escape, as his hands were cuffed behind his back and his pants were down around his ankles at the time of the toss. Four officers were on the scene.

103.    Deputy Ennis saw the defendant toss J.H. to the ground.   Deputy Ennis saw no reason for the defendant to toss J.H.   Deputy Ennis had never been trained to toss a handcuffed individual down on his back.

104.     The government also proved that the defendant engaged in another unreasonable use of force after he moved J.H. to the snow bank, when the defendant hit J.H. multiple times in the face while yelling that he could have hurt another officer.

105.    At the time that the defendant struck J.H., J.H. was sitting in the snow, with his pants down and his hands cuffed behind his back.

106.    Deputy Kolb had an unobstructed view as the defendant struck the victim in the

---

[1] On direct examination, the defendant claimed that he "dropped" J.H. because he thought J.H. spit or got blood on the defendant's face.   The government submits that this claim is simply not credible.   No other witness describes seeing J.H. spit or get blood on the defendant at the time of the toss.   Only Deputy Kolb describes seeing a small speck of blood on the defendant's face, but that was after the defendant struck J.H. in his bloodied face on the snow bank.   The defendant is not seen on Government Exhibit 8 wiping, cleaning, or otherwise touching his face after the toss. Further, the defendant himself failed to include this seemingly noteworthy information in his use of force report, which he wrote only ten days after the incident, and after viewing the Merson dashboard camera, raising the likelihood that that this information was a later fabrication made in a self-serving attempt to explain his actions.   However, even if the defendant's claim were true, the government submits that it would be an insufficient justification for throwing a handcuffed teenager to the ground on his back.

face at the snow bank.   Deputy Kolb did not think that J.H. was a threat, and he saw no reason for the defendant to strike J.H.

107.    Deputy Kolb saw no reason to use force against J.H., and he did not use force against him.

108.    Deputy Ennis would not have used the level of force the defendant used against J.H., and indeed, did not use any force against J.H. at the snow bank.

109.    No other officer except the defendant used any force against J.H. at the snow bank.

*III.*    *Willfulness*

110.    With regard to the third element that the government must prove, a person acts willfully if he acts voluntarily and intentionally with the specific intent to do something the law forbids.   Here, this means that the defendant acted with the specific intent to deprive J.H. of his right to be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force by one acting under color of law.   18 U.S.C. § 242; Ruschky, *Pattern Jury Instructions for Federal Criminal Cases*, District of South Carolina § V (modified); *United States v. Mohr*, 318 F.3d 613, 618 – 19 (4th Cir. 2003) ("[T]he government had to establish, inter alia, that [the defendant] acted (1) willfully, that is with the particular purpose of violating a protected right made definite by the rule of law or recklessly disregarding the risk that she would do so .…") (internal citations omitted); *United States v. Cobb*, 905 F.2d 784, 788 (4th Cir. 1990) (approving instruction: "If you find that a defendant knew what he was doing and that he intended to do what he was doing, and if you find that he did violate a constitutional right, then you may conclude that the defendant acted with the specific intent to deprive the victim of that constitutional right."); *United States v. McRae*, 795 F.3d 471, 479 (5th Cir. 2015) ("Section 242 has a willful mental state

requirement, which means that the prohibited act must have been done voluntarily and intentionally and with the specific intent to do something the law forbids.").

111.     Willfulness, like other states of mind, may be proved through circumstantial evidence because there is no way of directly scrutinizing the human mind to reveal precisely what someone was thinking at any given moment.   The Court may infer a defendant's state of mind from the surrounding circumstances.   In determining whether the defendant acted willfully, the Court may consider any facts or circumstances it deems relevant to shed light on what was in the defendant's mind.   For example, the Court may consider the manner in which any constitutional violation was carried out, and the duration of any constitutional violation.   The Court may also consider: what the defendant said; what the defendant did or failed to do; how the defendant acted; and whether the defendant knew, through training or experience, his actions were unlawful; and whether the defendant knew that his actions violated the policies of the West Virginia State Police or the defendant's training.   *Williams v. United States*, 341 U.S. 97, 102 n.1 (1951) (reciting with approval the trial court's instructions that the jury was "entitled to consider all the attendant circumstances: the malice, if any, of the defendants toward these men; the weapon used in the assault, if any; and the character and duration of the investigation, if any, of the assault, if any, and the time and manner in which it was carried out. All these facts and circumstances may be taken into consideration from the evidence that has been submitted for the purpose of determining whether the acts of the defendants were willful and for the deliberate and willful purpose of depriving these men of their Constitutional rights to be tried by a jury just like everyone else."); *United States v. Cowden*, 882 F.3d 464, 474 (4th Cir. 2018) ("To satisfy the element of 'willful' conduct, the government must prove that the defendant acted with the particular purpose of

violating a protected right made definite by the rule of law or recklessly disregard[ed] the risk that [he] would do so. Willfulness may be shown by circumstantial evidence, provided that the defendant's purpose reasonably may be inferred from all the connected circumstances.") (internal citations and quotations omitted).

112.    In proving willfulness, it is not necessary that the government prove that a defendant was thinking in constitutional or legalistic terms at the time of this incident.   The defendant need not be aware of the specific law or provision that his conduct violated.   It is sufficient that he commits an act with the intent to do something that the law forbids.   *Screws v. United States*, 325 U.S. 91, 106 (1945) ("The fact that the defendants may not have been thinking in constitutional terms is not material where their aim was not to enforce local law but to deprive a citizen of a right and that right was protected by the Constitution.   When they so act they at least act in reckless disregard of constitutional prohibitions or guarantees."); *United States v. Johnstone*, 107 F.3d 200, 210 (3d Cir. 1997) (upholding jury instruction that "[y]ou may find that a defendant acted with the required specific intent even if you find that he had no real familiarity with the Constitution or with the particular constitutional right involved, here the right to be free from the use of unreasonable or excessive force, provided that you find that the defendant intended to accomplish that which the constitution forbids."); *United States v. Dise*, 763 F.2d 586, 591 (3d Cir. 1985) (approving jury instruction that "[t]he Government need not prove that the deprivation of the constitutional rights was the predominant purpose of the defendant's actions.").

113.    The government proved, beyond a reasonable doubt, that the defendant acted willfully.

114.    The evidence proves that, as a trained state trooper with seven years of law

enforcement experience, the defendant knew that it was wrong to use unreasonable force against an arrestee, including using force where there was no threat and using more force than necessary to place a subject under arrest.   The defendant knew from his law enforcement training that it was wrong for an officer to use force to punish an arrestee.

115.   Captain David Lee of the West Virginia State Police described the training that the defendant received at the state police academy about the appropriate use of force.   That training spelled out for the defendant that he could only use force that was reasonable, and he was explicitly told that even if he were angry at an arrestee who had attacked an officer, he could not act on that anger.

116.   The evidence proves that the defendant engaged in multiple uses of increasingly unreasonable force against J.H. even though J.H. was not a threat to the defendant or any other officer, and even though J.H. was not attempting to escape at the times the defendant used force.

117.   The evidence proves that the defendant yelled words to the effect that J.H. could have hurt an officer while he was striking J.H. at the snow bank.   These words are not law enforcement commands or orders.   Rather, the words that the defendant yelled at J.H. while at the snow bank are evidence that the defendant used force on J.H. because the defendant was angry, and not because it was reasonably necessary under the circumstances.

IV.   *Bodily Injury*

118.   If the Court finds that the government proved the first three elements of Count One, then the Court should consider whether the government has proven beyond a reasonable doubt that the defendant's acts resulted in bodily injury to J.H.

119.   "Bodily injury" means a cut, abrasion, bruise, burn, physical pain, or any other

injury to the body, no matter how temporary.   The injury need not be significant, severe or permanent.   The government does not need to prove that the defendant intended to cause bodily injury, or that the defendant's acts were the sole cause of bodily injury.   18 U.S.C. § 242; Ruschky, *Pattern Jury Instructions for Federal Criminal Cases*, District of South Carolina § III (modified); *United States v. Perry*, 401 Fed.Appx. 56, 65 (6th Cir. 2010) (finding that "[t]he term bodily injury means: 1) a cut, abrasion, bruise, burn, or disfigurement; 2) physical pain; 3) illness; 4) the impairment of the function of a bodily member, organ, or mental faculty; or 5) any other injury to the body, no matter how temporary.").   Pain alone is sufficient to establish this element.   *Perkins*, 470 F.3d at 161 ("Physical pain alone or any injury to the body, no matter how fleeting, suffices" to establish bodily injury.)

120.    The government proved that J.H. suffered injuries as a result of the defendant's actions.

121.    Paramedic Luther Edward Brown observed bleeding on J.H.'s face and contusions on J.H.'s left hip and elbow. J.H. also informed Brown that his head hurt and that his handcuffs were too tight.

122.    The defendant, during his direct examination, admitted that, during the initial takedown of J.H., he used his foot to strike J.H. about the hips, which is consistent with the contusions that paramedic observed on J.H.   Testimony of Michael Kennedy, p. 29, l. 19 – p. 30, l. 4.

123.    In Government Exhibit 8, an excerpt from Deputy Merson's dashboard camera video, the defendant can be seen using his left hand to push J.H.'s bloodied face into the ground while forcefully striking J.H. eight times in the upper body with a closed fist.

124.     Trooper Walker described these strikes by the defendant as "compliance" strikes, which Trooper Walker defined as strikes that were designed to deliver pain.

125.     The defendant, on cross examination, admitted that the force he used during the initial takedown, during the cuffing process, and at the snow bank was intended to cause J.H. pain. Testimony of Michael Kennedy, p. 64, ll. 4 – 8, p. 65, ll. 11 – 20, p. 67, ll. 21 – 23.

126.     The defendant, on cross examination, admitted that he would have felt pain if someone struck him eight times in the back.   Testimony of Michael Kennedy, p. 66, ll. 1 – 3.

127.     In Government Exhibit 8, an excerpt from Deputy Merson's dashboard camera video, the defendant is seen tossing J.H. to the ground so forcefully that J.H. bounced and skidded on the ground.   J.H. landed on his back and his head, which is consistent with the pain caused by the headache and tight handcuffs that J.H. reported to paramedic Brown.

128.     As described by Deputies Kolb and Ennis, the defendant struck J.H. multiple times in his face, where he had already sustained lacerations and bleeding.

129.     In addition to the pain and contusions that paramedic Brown described, a review of the amount of force the defendant used against J.H., as seen in Government Exhibits 8 and 4, supports a reasonable inference, and confirms a common sense finding, that the defendant caused J.H. pain when he kicked and stomped on J.H. during the takedown; when he used eight closed-fist "pain compliance" strikes on J.H.; when he tossed a handcuffed J.H. on to his back and his

27

cuffed hands; and when he slapped J.H. multiple times in the face, all just moments after J.H. had already been injured in a serious car accident.

Respectfully submitted,

WILLIAM J. POWELL
UNITED STATES ATTORNEY

By:   /s/ Jarod J. Douglas
Jarod J. Douglas
Assistant United States Attorney

/s/ Christine M. Siscaretti
Christine M. Siscaretti
Trial Attorney

## <u>CERTIFICATE OF SERVICE</u>

I, Jarod J. Douglas, Assistant United States Attorney for the Northern District of West Virginia, hereby certify that on the 25th day of October 2019, the foregoing UNITED STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Byron Craig Manford, Esq.
PO Box 3021
Martinsburg, WV 25402
*Counsel for Defendant*

/s/ Jarod J. Douglas
Jarod J. Douglas
Assistant United States Attorney