## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

vs.                                          CRIMINAL ACTION NO. 3:19-CR-29

MICHAEL KENNEDY,

      Defendant.

### DEFENDANT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Defendant Michael Kennedy, by and through his undersigned counsel, submits these proposed findings of fact and conclusions of law pursuant to the Court's Order of Pretrial Conference [Doc. 53].

## I.   FINDINGS OF FACT

### A.   The Initial Accident and the Chase.

1.   Berkeley County Deputy Sheriffs Ryan Kolb, Austin Ennis, David Ritchie and Christopher Merson, along with Corporal Schoppert, were on duty on the shift beginning at 3:00 p.m. on November 18, 2018 and ending on 1:00 a.m. on November 19, 2018.  [Tr. 10/7/19, RK:27; AE:92-93, DR:138-139].[1]

2.   Troopers Derek Walker and Michael Kennedy were also on duty on the night of November 18-19, 2018.  While other troopers were working at that time, each was alone in his vehicle.  [Tr. 10/7/19, DW:169; Tr. 10/8/19, MK:136].

---

[1]  "Tr. 10/7/19" refers to a date of trial.  A set of initials followed by a colon and a number indicates the name of a witness and a page in the transcript.  LEB is Luther E. Brown, RK is Deputy Ryan Kolb, DE is Captain David Lee, AE is Deputy Austin Ennis, DR is Deputy David Ritchie, DW is Deputy Derek Walker, WJ is Captain Wilber Johnson, and MK is defendant Michael Kennedy.  Thus, "Tr. 10/7/19 RK:27" indicates the testimony given by Ryan Kolb on Oct. 7, 2019 at page 27 of the transcript for that day of trial.

3.      Deputies Ennis and Ritchie initially responded to a complaint from a person who said he was being chased by someone with a gun, and that the person ended up at Jack Rabbit's Bar.  Deputy Ritchie investigated the call and determined it was a fake call, and told the person to stop calling 911 or he would be put under arrest.  [Tr. 10/7/19, AE:93; DR:139].

4.      Later that night, Troopers Walker and Kennedy were both near Jack Rabbit's Bar on Route 11, also called the Williamsport Pike, when they heard a police radio call about a man who was calling 911 repeatedly. So, they both went to that bar, arriving around midnight.  The troopers located the individual who was making the calls and were talking with him when four Berkeley County Deputies, Kolb, Ritchie, Ennis and Merson, arrived, each in a separate cruiser. Deputy Merson was the last of the deputies to arrive.  At that time, Trooper Walker was still seated in his cruiser. [Tr. 10/7/19, RK:27-28, AE:93-94, DR:139 DW:169-171; Tr. 10/8/19, MK:8-9].

5.      Deputy Merson's vehicle was a black Ford Taurus with no light bar or regular markings.  Instead, the cruiser had "ghost lettering," that is, lettering which was visible only if the light hit it in a certain way.  [Tr. 10/7/19, AE, p. 94; DW:171-172].

6.      Trooper Walker was in the first of the two entrances to Jack Rabbit's.  The deputies pulled into the second entrance to the parking lot.  As Deputy Merson was slowing down to pull into that entrance, a silver colored vehicle rear-ended him.  [Tr. 10/7/19, RK:27-28, DW:172; Tr. 10/8/19, MK:12].

7.      As the vehicle hit Deputy Merson, the driver honked his horn.  Trooper Walker thought the driver was going to pull into the parking lot so the officers could get his information and take care of the accident.  Instead, the vehicle backed up and pulled around Deputy Merson's

cruiser and accelerated.  Deputy Merson turned on his lights and began to pursue the vehicle

northbound on Route 11.  Trooper Walker yelled to Trooper Kennedy, who was standing in the

parking lot facing Route 11, to get out of the way, and Trooper Walker activated his lights and

sirens and joined the pursuit.  His was the first car behind Deputy Merson's.  [Tr. 10/7/19,

DW:172-174; Tr. 10/8/19, MK:12].

8.      A dashcam in Deputy Merson's cruiser captured the chase and apprehension of

the suspect, J.H.  The video did not record sound.  [Gov.Ex. 2, Def.Ex. 3].

9.      Trooper Kennedy sprinted to his cruiser, jumped in and became the third vehicle

in pursuit, about 100 yards behind Trooper Walker.  He was driving about 110 miles an hour.

Deputies Ennis, Kolb and Ritchie also joined the pursuit.  [Tr. 10/7/19, RK:29, AE:95-97,

DR:145; Tr. 10/8/19, MK:12-13].

10.     Williamsport Pike is a highly-traveled route through a densely-populated area.  In

the area of the chase the road is hillier than it appears in the video.  The road was "pretty damp"

because of recent snow, so driving at high speeds was more dangerous than usual.  The speed

limit in that area is 45 miles per hour.  [Tr. 10/7/19, RK:54; Tr. 10/8/19, MK:14].

11.     Trooper Kennedy's first thought was whether Deputy Merson was all right.  He

did not think the accident was overly serious, but that it was not minor.  Trooper Kennedy said he

was wondering why J.H. was running. It seemed to him that J.H. hesitated after the accident, and

did not start running until Deputy's Merson's cruiser lights went on.  So, he thought that J.H.

specifically did not want to deal with law enforcement.  It was Trooper Kennedy's experience

that, at that time of night, intoxication might be involved.  [Tr. 10/8/19, MK:12-14].

12.     Deputies Kolb, Ennis and Ritchie heard radio transmissions from Deputy

Merson,  Trooper Walker did not have his radio turned to the Berkeley County Sheriff's frequency and so did not receive reports from Deputy Merson. Trooper Kennedy had both his in-cruiser radio and a portable radio in his vehicle so he could hear transmissions from both Deputy Merson and Trooper Walker.  As a result, he had a good idea of what J.H.'s vehicle was doing even though he had no direct vision of it at that time.  [Tr. 10/7/19, RK:29-20, AE:96, DW:145-146, 172-174; Tr. 10/8/19, MK:12, 15].

13.      Trooper Walker said that during the chase he was driving between 90 and 110 miles per hour.  He estimated the chase lasted about 90 seconds.  This is consistent with the video from Deputy Merson's cruiser, which shows the chase lasting approximately one minute and 33 seconds.  [Tr. 10/7/19, DW:174; Gov.Ex. 2, 0:21 to 1:53].

14.      During the chase, J.H. ran a car off the road onto the right shoulder, then swerved into the left hand lane.  About 10 seconds later J.H. ran a car off the road at the Bedington Crossroad near a convenience store, and about 15 seconds after that swerved off onto the right shoulder.  About 15 seconds later, J.H.'s vehicle went off the right hand side of the road, then back across both the north and south bound lanes of the road, hit a telephone pole and spun around. [Gov.Ex. 2, 0:43, 1:11, 1:23, 1:40, 1:53]

15.       When J.H.'s vehicle hit the telephone pole, there were two quick, small explosions, followed by a larger explosion which lit up the sky like daylight. [Gov.Ex. 2, 1:53 to 1:58; Tr. 10/7/19, RK:47, AE:97, DR:146, 175; Tr. 10/8/19, MK:16].

16.      The first explosion startled Trooper Walker. [Tr. 10/7/19, DW:202].

17.      Deputies Kolb, Ennis and Ritchie and Trooper Kennedy heard Deputy Merson give the vehicle signal 6, the term for an automobile crash. [Tr. 10/7/19, RK:30, AE:97, DR:155;

Tr. 10/8/19,  MK:16].

18.     Upon arriving at the scene of the crash, Trooper Walker looked around his cruiser for falling lines to make sure he would not get electrocuted when he stepped out of his cruiser. Trooper Walker regarded the situation as tense, and was worried about the safety of himself and of other officers.  [Tr. 10/7/19, DW:202].

19.     Trooper Kennedy did not see the accident occur.  When he saw the explosions, he became worried about live wires coming down.  [Tr. 10/8/19, MK:16].

**B.     The Scene of the Crash.**

20.     At the accident site, Trooper Walker got out of his cruiser and put on gloves.  He put his gloves on because he thought that, since J.H. had not exited the vehicle and started running, J.H. would have to be taken out of the vehicle.  Trooper Walker approached J.H.'s vehicle and looked in, but initially could not see anything because of the smoke coming from the vehicle. [Tr. 10/7/19, DW:184-185; Gov.Ex. 8, 0:10 - 0:19; Gov.Ex. 2, 2:21 - 2:34].[2]

21.     As the smoke cleared, Trooper Walker and Deputy Merson told J.H. to get out of the vehicle.  Trooper Walker could see J.H., although not well, but saw he was conscious and alert.  J.H. just stared at the officers, and did not respond to commands, and did not move. Trooper Walker saw no injuries to J.H.'s face at that time.  J.H. was in the passenger seat of the car, and apparently had not been wearing a seat belt.  [Tr. 10/7/19, DW:186-187, 202; LEB:15].

22.     Worried about being electrocuted, Trooper Kennedy looked around his cruiser to see if anything was laying on the ground, making him slow in getting out of his vehicle.  [Tr. 10/8/19, MK:17].

---

[2]   Gov.Ex. 8 is a segment of the Merson video.

23.     Trooper Kennedy jogged toward the wrecked vehicle with his firearm out.  The firearm had a flashlight mounted on it.  He saw Deputy Merson use his baton to break the window on the driver's side of the vehicle, and heard him yelling at J.H. to show his hands and get out of the vehicle. [Tr. 10/8/19, MK:18-19; Gov.Ex. 2, 2:36].

24.     Deputy Merson broke out the window of the vehicle and ordered J.H. to get out of the car.  J.H. just sat there staring at the officers.  A few seconds after Trooper Kennedy arrived, Deputy Merson and Trooper Walker pulled J.H. through the broken out driver's side window, deeming it necessary to place J.H. in handcuffs immediately.  Trooper Walker did not remember J.H. saying anything. [Tr. 10/7/19, DW:187-188; Gov.Ex. 8, 0:24 - 0:31; [Gov.Ex. 2, 2:38 - 2:40].

25.     J.H. landed on the ground, hard, sprawled out, with his pants pulled down halfway over his buttocks. [Gov.Ex. 2, 2:40].

26.     After J.H. was pulled from the vehicle, Trooper Kennedy shined his light on J.H. to look for his hands and check for a weapon, and saw none.  Trooper Kennedy could not get a good look at J.H.'s waistline, and so did not know if there was any weapon there.  [Tr. 10/8/19, MK:18-19; Gov.Ex. 2, 2:42].

### C.      The Compliance Strikes and Kicks

27.     J.H. was now on the ground, between having his belly down and being on his left side.  Trooper Walker was on top of J.H. and took hold of J.H.'s right hand. J.H. tried to tuck his arms under his body.  Deputy Merson was at J.H.'s right shoulder. [Tr. 10/7/19, DW:188-189; Gov.Ex. 8, 0:31; Gov.Ex. 2, 2:43].

28.     Deputy Ennis came up, and heard verbal commands from officers to give up and

stay still.  He saw that J.H. was resisting, moving his hands around and not trying to give up.

Deputy Ennis got down on his knees and focused on J.H.'s head and left shoulder area.  He could

feel J.H. tensing up and turning his head. Trooper Walker was sort of leaning over J.H. trying to

get J.H.'s arm in place behind his back so he could be handcuffed.  J.H. was resisting and trying

to pull his arm underneath him, but was not striking out at anyone. Trooper Walker was focused

on J.H.'s hands, because he had previously been in a situation before where he could have been

killed. Trooper Walker got a hold on J.H.'s right hand, but J.H. broke his grip a couple of times.

[Tr. 10/7/19, DW:189-190, AE:104-106, 126-127; Gov.Ex. 8, 0:20 - 0:40; Gov.Ex. 2, 2:44].

29.     Deputy Ennis said that, in his experience, if someone does not want to be

handcuffed, it is a difficult situation.  [Tr. 10/7/19, AE:126].

30.     Deputy Ennis could feel that J.H.'s body was tense, and remembered J.H. saying

something like "get off me."  Deputy Ennis also saw that J.H. had one hand tucked under his

body so it could not be secured.  Observing this resistance, Deputy Ennis administered closed-

hand strikes to J.H. in order to gain compliance by J.H..  [Tr. 10/7/19, AE:106, 126; Gov.Ex. 8,

0:40 - 0:43; Gov.Ex. 2, 2:49 - 2:52].

31.     Deputy Ennis said that tensing up is a way to resist being handcuffed.  He said one

cannot just observe tensing up, it has to be felt.  [Tr. 10/7/19, AE:127].

32.     When J.H. still did not comply with verbal commands to give up, Deputy Ennis

executed a less than full force strike to J.H. in an attempt to get J.H. handcuffed and a knee

strike.  Deputy Ennis thought his use of these strikes was reasonable and necessary to gain

compliance by J.H. [Tr. 10/7/19, AE:101, 125; Gov.Ex. 8, 0:43 to 0:46; Tr. 10/8/19, MK:95;

Gov.Ex. 2, 2:53].

33.      Deputy Ennis also administered a knee strike to J.H., deeming it necessary and reasonable to gain compliance.  [Tr. 10/7/19, AE:125; Gov.Ex. 2, 2:53].

34.      Trooper Kennedy saw J.H. try to tuck his legs and attempt to get up.  Trooper Kennedy thought J.H. posed a potential threat because he had already fled at a high rate of speed, endangered others and apparently had no regard for the safety of others.  In addition, J.H. was not complying with commands to give an officer his hands.  Trooper Kennedy saw J.H. struggling to tuck his hand under his body and, seeing no weapon in J.H.'s hand, decided it was best to put his weapon away.  He had difficulty turning off the flashlight, and some difficulty in holstering his gun due to the stress of the situation.  While the video shows another officer approaching, Trooper Kennedy said he did not see that officer approach on the night of the incident.  [Tr. 10/8/19, MK:20, 22; Gov.Ex. 8, 2:41 - 2:44].

35.      While he was trying to holster his gun, Trooper Kennedy saw J.H. try to tuck his legs toward his center mass as if to stand up.  As Trooper Kennedy was near J.H.'s feet, he tried to kick J.H.'s legs out from under him.  He did not then know what other officers were doing. [Tr. 10/8/19, MK:22-23; Gov.Ex. 8, 0:44 - 0:46; Gov.Ex. 2, 2:50 - 2:56].

36.      Deputy Merson hit the back of J.H.'s head with his knee, which caused J.H.'s head to hit the pavement. Deputy Ennis delivered a series of closed fist strikes to the side of J.H.'s head.  One of the deputies kicked J.H. on his upper left torso.  Meanwhile Trooper Walker was struggling with J.H.'s right hand.  J.H. was still trying to tuck his hands, and could have been reaching for something in his belt.  J.H. was also tucking his legs up to his chest.  At this point, J.H. had not been patted down for weapons. Meanwhile, Trooper Kennedy was still trying to put his gun away.  [Tr. 10/8/19, MK:23, 27, 95; Gov.Ex. 2, 2:43 - 2:48].

37.     J.H. continued to try to post up, that is, get his legs under his body.  Trooper

Kennedy grabbed a leg to pull it out from under J.H..  J.H. actively resisted, so Trooper Kennedy

delivered two or three compliance kicks aimed at the nerve ending in the knee to try to deaden

the leg so it could not be pulled up.  Trooper Kennedy heard other officers ordering J.H. to

surrender his hands. Because of J.H.'s prior actions, Trooper Kennedy was worried that he would

try to kick out again.  So, Trooper Kennedy put his foot on J.H.'s buttocks to pin his hips to the

ground.  At this time, J.H. was on his stomach. [Tr. 10/8/19, MK:28-30; Gov.Ex. 2, 2:49].

38.     J.H.'s legs stopped moving, so Trooper Kennedy assumed that he was done

resisting. Trooper Kennedy heard Deputy Merson say something about his back seizing, and

circled around to take control of the front side of J.H.'s body.  He then noticed Deputy Ennis was

there. Trooper Kennedy decided to move Deputy Merson away from J.H., thinking the other two

officers could handle the situation, as it seemed as if the handcuffing was almost done. [Tr.

10/7/19, DK, p. 191-192; Gov.Ex. 8, 0:57; Tr. 10/8/19, MK:30; Gov.Ex. 2, 2:59 - 3:03].

39.     Seeing Deputy Merson get up, and also thinking that J.H. had been handcuffed

and was no longer resisting, Deputy Ennis got up and walked away to gather himself and wind

down from the "pretty intense situation."  Deputy Merson was complaining that his back was

hurt. [Tr. 10/7/19, AE:107-111; Gov.Ex. 8, 0:54; Gov.Ex. 2, 3:05].

40.     Deputy Ritchie arrived about this time.  Deputy Ritchie heard officers yelling, but

did not remember exactly what was said.  He saw only the tops of the officers' heads, because his

view was blocked by the wrecked vehicle of J.H.  [Tr. 10/7/19, DR:147-148; Gov.Ex. 2, 3:09].

41.     When Deputy Ritchie got around J.H.'s car, he saw officers standing up, and J.H.

on the ground.  Trooper Walker was down on a knee with J.H..  It appeared to Deputy Ritchie

that Trooper Walker was holding J.H.'s hands behind his back.  Deputy Ennis, Deputy Merson and Trooper Kennedy were walking away from J.H.  [Tr. 10/7/19, DR:149; Gov.Ex. 2, 3:09].

42.     Deputy Ritchie saw lacerations on J.H.'s face, which he said appeared to be from the traffic accident.  J.H. was not saying anything and did not appear to be moving. As it appeared that his assistance was not needed, Deputy Ritchie walked over to Deputy Merson, who said that his back and neck were hurting from the accident. Deputy Ritchie tended to Deputy Merson, trying to get him to lay on the ground and to provide neck support for him. [Tr. 10/7/19, DR:149, 152-153; Gov.Ex. 8, 1:04 - 1:13; Gov.Ex. 2, 3:13].

43.     However, J.H. had not been handcuffed.  [Tr. 10/7/19, AE:109-110].

44.     Trooper Kennedy then saw Deputy Ennis out of the corner of his eye, and realized Trooper Walker was now alone with J.H. He looked over and saw that J.H. was not yet handcuffed, and saw there was a cut on the side of J.H.'s face.  Trooper Walker initially had both of J.H.'s in his two hands, then held them down with his right hand.  J.H. was actively resisting being handcuffed, so Trooper Kennedy put his knee on J.H.'s back to hold J.H. down.  [Tr. 10/7/19, DW:192-194.; Gov.Ex. 8, 0;57 - 1:00; Tr. 10/8/19, MK:31; Gov.Ex.2, 3:10]

45.     Trooper Walker got his handcuffs out, but had to switch his hold on J.H.'s hands from his right hand to his left.  As he did that, J.H. got his right arm free and put it out in front of him, either trying to "post up" or get it back under his body.  Trooper Walker grabbed after J.H.'s right hand with his right hand to pull J.H.'s arm back behind his back, yanking the arm with force. J.H. remained tensed up, and moved his right arm again in an attempt to move his arm out and away from Trooper Walker's grip.  Trooper Walker had J.H.'s hands, but not under control. J.H. was tensed up throughout this time.  [Tr. 10/7/19, DW:194-195, 205; Gov.Ex. 8, 1:07 - 1:13;

Gov.Ex. 2, 3:16 - 3:17]

46.     Deputy Ennis said that if J.H. was then tensing up, one could not just see it. [Tr. 10/7/19, AE:128].

47.     Trooper Walker was still trying to handcuff J.H.  Before Trooper Kennedy administered any compliance strikes, J.H. lifted his head and Walker saw blood running down the left side of his face.  This was the first Trooper Walker saw of injury to J.H..  [Tr. 10/7/19, DW:203-205; Gov.Ex. 2, 3:13].

48.     Trooper Kennedy saw Trooper Walker attempt to get a cuff on one of J.H.'s hands, then looked away because it seemed that J.H. was compliant.  But he heard Trooper Walker shout out something, and he looked around and saw that J.H. had pulled a hand away and was actively resisting again.  So, he got off of his knee and delivered a set of five compliance strikes targeting the shoulder or meaty part of the back of J.H..  [Tr. 10/7/19, DW:195, 205-207; Gov.Ex. 8, 1:13.; Tr. 10/8/19, MK:31-32; Gov.Ex 2, 3:18].

49.     Trooper Walker said that the strikes did not appear to have any effect, as J.H. did not become complaint.  [Tr. 10/7/19, DW:206].

50.     Trooper Kennedy did not understand why J.H. yanked his hands away again.  His experience told him that J.H. might be intoxicated, or something like that, because resistance tends to ebb and flow with intoxicated suspects, tiring out and then coming back in bursts. [Tr. 10/8/19, MK:32-33].

51.     Trooper Kennedy said he was seeking pain compliance, and struck a little harder than normal because of J.H.'s repeated noncompliance.  He said he was trying to end the confrontation quickly because in his experience, these situation "tend to only evolve further if

you don't act quickly."  Trooper Kennedy was concerned that the compliance strikes were ineffective.  [Tr. 10/8/19, MK:33].

52.     After the first set of compliance strikes, J.H. continued to actively resist and got both of his arms free. Trooper Kennedy readjusted J.H.'s left arm so that Trooper Walker could get hold of it and put the handcuffs on.  [Tr. 10/7/19, DW:206-207; Gov.Ex. 2, 3:24].

53.     Trooper Walker got the handcuff on J.H.'s right hand and got ready to handcuff the left hand.  J.H.'s left hand broke free, so Trooper Kennedy helped Trooper Walker get that hand back to the small of J.H.'s back.  Trooper Kennedy felt tension resistance in the arm, which indicated to him that J.H. intended to pull the arm away again, and was an indication of a potential attempt at flight.  So, as soon as Trooper Walker reached over and grabbed the other hand, Trooper Kennedy delivered three more strikes in an effort to both disrupt J.H.'s ability to pull away and to distract him, at the same time shielding J.H.'s head and holding it down with his left hand to prevent J.H.'s head in case a strike to the back should glance off. [Tr. 10/7/19, DW:196, 209; Gov.Ex. 8, 1:18; Tr. 10/8/19, MK:34-35, 87; Gov.Ex. 2, 3:24].

54.     After the second set of strikes, Trooper Kennedy saw that J.H. had been cuffed so he disengaged, and had a brief moment of relief thinking the confrontation was over.  [Tr. 10/8/19, MK:36; Gov.Ex. 2, 3:27].

55.     Trooper Walker said that if J.H. had not actively resisted only one officer would have been needed to handcuff him.  [Tr. 10/7/19, DW:209-210].

56.     Deputy Ennis said that he did not see anything that made him think that Trooper Kennedy was using too much force.  [Tr. 10/7/19, AE:130, 131].

**D.     The trip of Trooper Walker and the "Toss."**

57.     Trooper Walker intended to put J.H. in his cruiser, as was his practice.  However, because his cruiser did not have partitions, he would have had to stay with J.H., as he had weapons in the cruiser. [Tr. 10/7/19, DW:197-198, 211].

58.     As Trooper Walker picked up J.H., J.H. actively resisted, first by tensing up his whole body.  Then J.H. jerked his body in a direction different from where Trooper Walker was headed, and Trooper Walker tripped and fell.  Trooper Walker did not recall J.H. saying anything. [Tr. 10/7/19, DW:197, 210; Tr. 10/7/19, DR:155-156; Gov.Ex. 8, 1:22; Gov.Ex. 2, 3:30][3]

59.     Trooper Kennedy glanced at the wrecked vehicle to make sure there was no fire, and then saw Trooper Walker falling to the ground with his and J.H.'s legs tangled.  He assumed J.H. had tripped Trooper Walker intentionally, and saw that J.H. was laying near the injured Deputy Merson.  [Tr. 10/8/19, MK:37; Gov.Ex. 2, 3:28 - 3:30].

60.     Trooper Kennedy then viewed J.H. as an active combatant, and decided to get him away from the injured officer as quickly as possible.  As pain compliance had not seemed to be effective, and J.H. continued to resist even in handcuffs, Trooper Kennedy thought he needed a different way to try to break through.  So, he scooped J.H. off the ground by the front of his shirt and told J.H. that he needed to stop fighting.  Trooper Kennedy hoped that J.H. would be intimidated by his presence and the manner in which Trooper Kennedy was handling J.H.  Trooper Kennedy said he was not angry at J.H. at that moment. [Tr. 10/8/19, MK:38, 53; Tr. 10/7/19, DR:156-157; AE:113-114; Gov.Ex. 2, 3:34 - 3:37].

_____

[3]   Trooper Walker said that J.H.'s tensing and jerk did not show up well on the video, but that he had felt it at the time.  [Tr. 10/7/19, DW:210].

Page 13 of  38

61.     Deputy Ennis said he heard Trooper Kennedy talking to J.H. in a raised voice, but not in an angry tone. [Tr. 10/7/19, AE:113-114].

62.     Deputy Ennis understood why J.H. was moved.  He said that, without talking with Trooper Kennedy, he could not say whether the method of moving was necessary. Deputy Ennis thought there were better ways to move the subject than the method Trooper Kennedy used.  He said he had not been trained in that method, and he could not remember if he had seen anyone do it before.  He said that he personally would not have moved J.H. in the manner done by Trooper Kennedy. [Tr. 10/7/19, AE:114-115].

63.     J.H. responded to being lifted up by yelling an obscenity in Trooper Kennedy's face, and Trooper Kennedy felt something wet, which he assumed was spit, hit his face.  Trooper Kennedy thought he then just dropped J.H., but conceded that the video showed he may have done it harder, probably because he was "amped up."  The video shows that Trooper Kennedy extended his arms outward and released J.H.; he did not slam J.H. to the ground. [Tr. 10/8/19, MK:38, 74; Gov.Ex. 8, about 1:27; Gov.Ex. 2, 3:37]

64.     Deputy Ritchie did not see what happened after Trooper Kennedy picked J.H. up, as he was tending to the injured Deputy Merson. The next thing he remembered was J.H. laying on the ground in the grass area to the right of the roadway, still handcuffed behind his back.  [Tr. 10/7/19, DR:157-158, 160-162; Gov.Ex. 2, 3:39]

65.     Trooper Kennedy said that he had been trained in the field to pick up a person by shirt. Trooper Kennedy agreed he had not been trained to toss someone to the ground who his cuffed behind his back.  Deputy Ennis said the same.  Deputy Ritchie said he had not been trained to pick up a suspect by the shirt, and saw no reason for picking up J.H. in that manner.

[Tr. 10/8/19, MK:54-55; Tr. 10/7/19, AE:115, DR:157].

66.     As Trooper Kennedy picked up J.H., Trooper Walker walked away from J.H. because he was upset that he had been tripped.  He did not have any further physical contact with J.H. or see J.H. after that, and did not see anything else that Trooper Kennedy did. Instead, he looked into J.H.'s car. [Tr. 10/7/19, DW:199-200; Gov.Ex. 2, 3:37 - 3:50].

67.     Deputy Ennis thought his assistance was not needed with J.H. at this point, so he walked away to gather himself and wind down.  J.H. was then laying on the ground and offering no resistance.  [Tr. 10/7/19, AE:116; Gov.Ex. 8, 1:48; Gov.Ex. 2, 3:28].

68.     Trooper Kennedy denied he wanted to hurt J.H. by tossing him on the ground. Rather, when the blood or spit hit his face he reacted to create space by, as he remembered, dropping him.  He conceded that his action appeared "a little rougher" than he had intended. [Tr. 10/8/19, MK:88-89].

69.     Trooper Kennedy said that if an individual intentionally spits in an officer's face it is the same as an individual striking the officer.  Since he was unsure whether J.H. was acting intentionally, he did not treat it as immediate aggression and so did not use any kind of implement or spray on J.H.  [Tr. 10/8/19, MK:56-57].

70.     Trooper Kennedy said he was wondering why J.H. had continued to resist. He bent over J.H., looked down at him and asked if he was done and if this was over.  J.H. did not respond.  Someone walked up and shined a light over J.H., and Trooper Kennedy saw for the first time that it looked like J.H.'s eyes were dilated pretty good. Trooper Kennedy saw blood on J.H.'s face.  Trooper Kennedy tried to pull J.H.'s pants up, but J.H. would not aid in that effort. Trooper Kennedy then quickly checked J.H.'s pockets for weapons.  Trooper Kennedy was then

satisfied that J.H. would not try to run.  [Tr. 10/8/19, MK:39, 83-84; Gov.Ex. 2, 3:41 - 4:09].

71.      Trooper Kennedy said that the possibility that J.H. had weapons was always a factor, and always in his mind. [Tr. 10/8/19, MK:84].

**E.    The Snowbank.**

72.      Trooper Kennedy was content to leave J.H. where he was, but heard another deputy say something about moving everyone a little further from the wrecked vehicle.  The ambulance was coming to meet them at Williamsport Pike, and J.H. would be transported. Trooper Kennedy decided to move J.H. closer to that road.  Deputy Ennis came over and helped him.  J.H. refused to stand or walk, so Trooper Kennedy and Deputy Ennis carried J.H. over toward Williamsport Pike. Each officer had J.H. under the shoulder blade or arm to carry him. [Tr. 10/7/19, AE:116-117, 119; Gov.Ex. 8, 2:05; Gov.Ex. 5, 0:04; Tr. 10/8/19, MK:40-41; Gov.Ex. 2, 4:18].

73.      Deputy Ennis considered J.H.'s refusal to walk a form of resistance.  [Tr. 10/7/19, AE:124].

74.      When J.H. had been carried to the intersection of Williamsport Pike, Trooper Kennedy said that was far enough, and if he did not want to walk, we'll let him down here. Deputy Ennis did not disagree.  So, J.H. was laid down off the roadway, away from the risk of a vehicle running over his feet. [Tr. 10/7/19, AE, p. 117-118; Tr. 10/8/19, MK:41-43].

75.      Trooper Kennedy then bent down, looked at J.H., and asked in a raised voice: "Why are you doing this?  Are you aware of what you did?" J.H. looked at Trooper Kennedy and replied with belligerence, although Trooper Kennedy did not remember J.H.'s exact words.  [Tr. 10/7/19, AE:120; Tr. 10/8/19, MK:41].

76.    J.H. then tried to sit up.  Trooper Kennedy did not want to risk him standing up and becoming combative again, so he grabbed J.H. by the shirt and pushed him back down on the ground, and told J.H. he needed to stay on the ground.  Trying to break through to J.H., Trooper Kennedy told J.H. that he could have paralyzed somebody, could have killed somebody.  J.H. replied that he did not care. [Tr. 10/8/19, MK:41-42, 80].

77.    J.H. kept trying to sit up, despite Trooper Kennedy's repeated instructions to stay down.  Trooper Kennedy kept pushing J.H. back down to the ground.  Then, he held J.H. and leaned in and told him he needed to stop.  During this series of actions, Trooper Kennedy slapped J.H. fairly lightly, twice, on the face with an open left hand in an effort to snap J.H. out of his attitude and make the resistance stop.  Deputy Ennis said that Trooper Kennedy used "a light strike or slap" with an open hand.  [Tr. 10/7/19, AE:121-122, 124-125, 128-129, 132; Tr. 10/8/19, MK:41-42].

78.    Trooper Kennedy is right handed.  He used his left hand because he saw that J.H. was injured on the right hand side of his face and Trooper Kennedy did not want to rip open any wounds.  He was trying to gain compliance, not injure J.H.  [Tr. 10/7/19, AE:132; Tr. 10/8/19, MK:42].

79.    Deputy Ennis said, twice, that he saw reason for force to be used on J.H. at the snow bank. He said he might not have used that type of force, but that the force used by Trooper Kennedy was not excessive.  Deputy Ennis said that if he had observed clear and blatant excessive force, he would have at least gone to the officer and asked why the officer had acted that way.  Deputy Ennis made no such inquiry of Trooper Kennedy. [Tr. 10/7/19, AE:122-123, 131, 135].

80.     Deputy Ritchie did not see J.H. being moved from the grass to the snow bank. He took a quick look, "two or three seconds at the most," and noticed that J.H. was lying about 15 to 20 feet behind him, laying face down on a snow bank with his head pointed north and Trooper Kennedy standing at his feet. He saw no additional injuries to J.H.  [Tr. 10/7/19, DR:160-162].

81.     At the time of his arrival, Deputy Kolb saw J.H. being moved from the front of Deputy Merson's cruiser to a snow bank, which was about four feet high, just off the side of the road, but did not remember seeing anyone other than Trooper Kennedy moving J.H.  Deputy Kolb understood that the reason J.H. was being moved to the snowbank was so he would be more accessible to the medics who were on the way. [Tr. 10/7/19, RK:31-32, 48-49, 51].

82.     Deputy Kolb saw a "small speck of blood" on Trooper Kennedy's face.  He told Trooper Kennedy about it, and Trooper Kennedy wiped it off. [Tr. 10/7/19, RK:41].

83.     Deputy Kolb said that J.H. kept trying to sit up and Trooper Kennedy was pushing him down and telling him to quit, to stop resisting, to stay there and that the ambulance was on the way, but that J.H. would not cooperate and kept sitting up and disobeying instructions four or five times.  [Tr. 10/7/19, RK:51-52].

84.     Deputy Kolb said that Trooper Kennedy was reacting to something J.H. was doing.  [Tr. 10/7/19, RK:60].

85.     Deputy Kolb said that a subject who was acting like J.H., not following instructions, would cause him concern that J.H. would try to escape or strike him with his head or trip him.   He said that, given the events of the evening, there was "absolutely" reason to fear that J.H. might flee. [Tr. 10/7/19, RK:51-53].

86.     Deputy Kolb said that he that been trained to jump in and stop another officer if

excessive force was being use.   He did not attempt to intercede with Trooper Kennedy and stop his actions involving J.H.   Deputy Kolb said he would not have hesitated to intercede if he thought that Trooper Kennedy had gone overboard but that, in his opinion, Trooper Kennedy had not gone overboard. [Tr. 10/7/19, RK:56, 59-60].

87.     Trooper Kennedy was frustrated because it appeared that none of his compliance techniques were working.  He said that he could not figure out why, but thought J.H. was "on something."  Trooper Kennedy said that in his experience, it is hard to deal with people who are on any kind of intoxicants or drugs because pain compliance techniques are generally ineffective with them.  [Tr. 10/8/19, MK:43].

88.     Trooper Kennedy said he did not put J.H. in his cruiser because his cruiser was some distance away, and he does not have a cage in his cruiser.  So, he would have had to stay with J.H.  Also, it was not Trooper Kennedy's arrest, it was the sheriff department's arrest, so he was waiting for a deputy to take command of J.H.  At that point, Trooper Kennedy disengaged and had no further contact with J.H. [Tr. 10/8/19, MK:89].

89.     Throughout these events, which lasted only three minutes, Trooper Kennedy was also coming off of the fear from the explosion, and was worried about Deputy Merson being injured.  However, he said he was not angry, but was, rather, frustrated.  [Tr. 10/8/19, MK:33-34; Gov.Ex. 2, 2:39 - 4:32; Gov.Ex. 5, 0:03 - 1:00].[4]

F.     **Bodily Injury to J.H.**

---

[4]   Gov.Ex. 5 is the video from the cruiser of Deputy Ritchie, with an enlargement.  The time length of events comes from adding the time periods of the videos cited.  Deputy Ritchie's video picks up about where Deputy Merson's video ends.  Even with the enlargement Gov.Ex. 5, it is not possible to discern exactly what is happening or who is pictured.

90.     When Luther Edward Brown, Jr., a paramedic with the Berkeley County Emergency Ambulance Authority, arrived, J.H. was sitting on the ground, handcuffed. J.H. did not appear to be in any distress except for being upset about being handcuffed. [Tr. 10/7/19, LEB:7-9, 11, 13].

91.     Mr. Brown estimated J.H. to be about 5'8" tall and 140 pounds. [Tr. 10/7/19, LEB:9].

92.     Mr. Brown noticed that J.H. had some bleeding and abrasions on the left side of his face, but observed no other injuries.  [Tr. 10/7/19, LEB:9-10].

93.     J.H. told Mr. Brown he had been in a car wreck.  J.H. told Mr. Brown that he had a headache, and that when he woke up he remembered being in the passenger seat of the vehicle. [Tr. 10/7/19, LEB:10].

94.     Mr. Brown cleaned and bandaged J.H.'s head with gauze, and placed a C-collar on him to protect his spine.  [Tr. 10/7/19, LEB:10].

95.     Next, Mr. Brown disrobed J.H. to check for injuries. He found contusions on the left hip and left elbow.  [Tr. 10/7/19, LEB:11, 16].

96.     Mr. Brown rode to the hospital with J.H. in the back of the ambulance.  No one else was present in the back of the ambulance.  [Tr. 10/7/19, LEB:11-12].

97.     Mr. Brown testified that J.H. "complained about the headache.  And then we asked him his pain scale. He said he didn't have any.  He told me he woke up in the passenger's seat, and then he said he got tossed on the ground. . . .  That was the extent of our conversation. He did complain about his handcuffs being too tight which I assessed for that.  There was plenty of room.  He had good P.M.S. there.  Good capillary refills so they weren't cutting off the

circulation." [Tr. 10/7/19, LEB:12; 15-16].

98.     Mr. Brown said that the injuries suffered by J.H. were consistent with what he had

observed when attending to other motor vehicle accidents, of which he had seen "lots." [Tr.

10/7/19, LEB:13-14].

99.     J.H. told Mr. Brown that he had used marijuana about an hour before the accident.

[Tr. 10/7/19, LEB:14].

**G.     Training Given to Officers.**

100.    Each of the Troopers Walker and Kennedy and Deputies Kolb, Ennis and Ritchie

attended the 25 week program at the W.Va. State Police Academy, during which each received

use-of-force training. [Tr. 10/7/19, RK:25-26, AE:91-92, DR:91, DW:137-138, 167-168, DL:67,

Gov.Ex. 6; Tr. 10/8/19, MK:7, 44-45].

101.    Trooper Kennedy also received three months of field training during which he

worked with an experienced trooper.  [Tr. 10/8/19, MK:44].

102.    As of November 2018, Troopers Walker and Kennedy each had about 8 years of

police experience.   [Tr. 10/7/19, DW:166-167; Tr. 10/8/19, MK:7, 136].

103.    As of November 2018, Deputy Ennis had been with the Berkeley County Sheriff's

Department for about three years, Deputy Ritchie for about three years, and Deputy Kolb for

about one year. [Tr. 10/7/19, AE:91, DR:137, RK:25].

104.    Troopers and deputies are taught to use force proportional to the resistance of a

subject as is necessary to effect an arrest.  They are also instructed that the officer is to use force

which is one level higher than the force used by the subject, and that when the subject no longer

poses a threat, force should no longer be used. The level of the force used is dictated by the

subject and the situation, as the officer wants to keep the upper hand in the situation, and the officer often does not know if the subject is armed and dangerous or might flee. [Tr. 10/7/19, RK:25-26, 46-47, AE:91-92, DR:137-138, DW:167-168; Tr. 10/8/19, MK:45].

105.    At the W.Va. Police Academy, officers are taught "pain compliance techniques" including pressure points, joint manipulation, use of pepper spray, use of tasers and closed-fist strikes. Closed-fist strikes to large muscle groups, like those in the back and the hips, are permissible pain compliance techniques.  Officers are taught  that continued noncompliance by a subject is one of the factors to be considered regarding use of force, and that among the factors for appropriate use of force include whether a person was actively resisting arrest or trying to flee and whether it was a tense, uncertain or rapidly evolving situation. Officers are taught that under federal law an officer is not required to use the least amount of force available under federal guidelines.  [Tr. 10/7/19, DL:71, 80-81, 87-89; Gov.Ex. 6, p. 13, 20, 59].

106.    Officers are taught that whether a level of force is reasonable is "judged from the perspective of a reasonable officer coping with a tense, fast evolving situation." [Gov.Ex. 6, p. 13].

107.    Officers are taught that if a subject refuses to move, uses the weight of his body to defeat control of the officer or if the subject is pulling away from the officer, then the officer may strike muscle groups and use take downs. Kicking techniques are also permitted. [Gov.Ex. 6, p. 59-60].[5]

---

[5]    Trooper Kennedy did not immediately submit a written report of the events of November 18-19.  As he was in pursuit of J.H., Trooper Kennedy heard over his cruiser radio when Trooper Walker reported to their shift supervisor that they were engaged in the pursuit. Later that night, back at their office, Trooper Kennedy asked Trooper Walker if he had talked to their supervisor, Sergeant Cole, and told him about the incident.  Trooper Walker said he had

## II.   PRINCIPLES OF LAW AND DISCUSSION

### A.   Elements of the Offense Charged.

In order to establish a violation of 18 U.S.C. § 242, the government must prove, beyond a reasonable doubt, each of the following elements:

1.      That then Trooper Kennedy acted under color of law;

2.      That Trooper Kennedy deprived J.H. of the constitutional right to be free from

unreasonable seizures, including the unreasonable use of force; and

3.      That Trooper Kennedy acted willfully to deprive J.H. of his constitutional right.

United States v. Mohr, 318 F.3d 613, 618-19 (4th Cir. 2003).

In addition, in order to convict Trooper Kennedy of a felony violation, the government

must prove beyond a reasonable doubt that, as a result of Trooper Kennedy's actions, J.H.

---

done that.  It was Trooper Kennedy's understanding that because it was the sheriff's department pursuit, in which he had just assisted, that the sheriff's department would document the incident. In addition, before he left the accident scene, Trooper Kennedy told one of the deputy sheriffs that if they needed a statement from him, he would give them one. [Tr. 10/8/19, MK:69, 91-92]. Trooper Walker later gave a written report when Sergeant Cole asked for it. [Tr. 10/8/19, MK:71].

Captain Willy Johnson of the Berkeley County Sheriff's Department was responsible for administering the computer collection of the videos from the dashcams in the cruisers of the deputies.  Captain Johnson went to the site of J.H.'s accident and spent about two hours there taking pictures, making measurements and talking with power company workers.  Captain Johnson also saw Deputy Merson at the station house that same night. [Tr. 10/7/19, WJ:214-218].

However, Captain Johnson did not get any video from the deputies' dashcams for about a week.  Captain Johnson blamed the delay on technical problems.  The first video he received was the one from Deputy Ritchie's cruiser.  The "technical problems" were apparently unnoticed by Captain Johnson for a significantly longer time.  He did not obtain the video from Deputy Merson's cruiser until sometime later, and then discovered that over 160 videos from Deputy Merson's cruiser had not been downloaded. [Tr. 10/7/19, WJ:219-220].

Thus, any delay in reporting was due to a misunderstanding by Troopers Kennedy and Walker about who would do what, and to a breakdown in the video collection system of the Berkeley County Sheriff's Department.

suffered bodily injury. 18 U.S.C. § 242; United States v. Cowden, 882 F.3d 464, 475 (4th Cir. 2018) ("A violation under Section 242 constitutes a felony offense if the defendant caused bodily injury to the victim, but the violation is a misdemeanor offense when no bodily injury resulted."); United States v. Perkins, 470 F.3d 150, 151, n. 1 (4th Cir. 2006) (same).

Trooper Kennedy does not deny that, at the time of the incident, he acted under color of law. However, the government failed to prove any of the other elements of the violation beyond a reasonable doubt.[6]

The element of violation of a federally protected right through the unreasonable use of force is a separate and distinct element from the element of whether that violation was committed willfully. "The threshold question here, then, is whether [Trooper Kennedy] violated the constitutional rights of [an] individual[] [he] detained or arrested. If [he] did so, the next question would be whether [he] acted with the specific intent to violate those rights. These two questions are logically, and legally, independent." United States v. Reese, 2 F.3d 870, 884 (9th Cir. 1993).

### B.     The Use of Force Element.

The standard for assessing a police officer's use of force for purposes of 18 U.S.C. § 242 is one of "objective reasonableness." Under this standard, the fact finder must determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force." United States v. Perkins, 470 F.3d 150, 159 (4th Cir. 2006) (citation omitted).

---

[6] At the conclusion of the trial, in response to a question from the Court, Mr. Manford indicated that the defense was contesting only the issues of unreasonable force and bodily injury. [Tr. 10/8/19, pp. 117-118]. Although this seems clear on the record, Mr. Manford misheard and then misspoke. The defense concedes only the "color of law" element. Mr. Manford notified the government of this fact by email on October 17, 2019.

. . . Courts judge "[t]he 'reasonableness' of a particular use of force . . . from the perspective of a reasonable officer on the scene," not "with the 20/20 vision of hindsight." Graham, 490 U.S. at 396. When doing so, a court should focus "on the circumstances at the moment force was used." Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir.1996).

Estate of Jones v. City of Martinsburg, 2014 U.S. Dist. LEXIS 146622 (N.D.W.Va. Oct. 15, 2014) at *14, *aff'd in part, rev. and remanded in part on other grounds*, 726 Fed. Appx. 173 (4th Cir. 2018).

"Threat" in the § 242 context, means not only the possibility of harm to the officer or others, but also threat of fleeing. A police officer may use such force as is necessary to "bring a subject into custody or keep an arrestee in custody." United States v. Coughlin, 609 F. App'x 659, 661 (1st Cir. 2015). As the Court said in Graham v. Connor, 490 U.S. 386, 396 (1989):

> [T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. . . . Because "[t]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application," however, its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively ***resisting arrest or attempting to evade arrest by flight***.

(citations omitted, emphasis added).[7] However, the events which "set the stage" for the use of force must also be considered. Bazan v. Hidalgo County, 246 F.3d 481, 493 (5th Cir. 2001) (in a deadly force case, the court should consider what happened before the moment when force was used).

When a person actively resists being handcuffed and refuses to obey an officer's instructions, that person poses an immediate threat to officers. Poole v. City of Shreveport, 691

---

[7] Graham was an excessive force case brought under 42 U.S.C. § 1983, which is the civil version of 18 U.S.C. § 242. The analysis of whether the use of force was reasonable is the same in either context. United States v. Perkins, 470 F.3d 150, 159, n. 12 (4th Cir. 2006)

F.3d 624, 629 (2012) (affirming summary judgment in favor of police officers where unarmed

truck driver exited vehicle, but resisted being handcuffed and was then tasered and wrestled to

the ground by two police officers, holding use of force was not unreasonable); Rudlaff v.

Gillispie, 791 F.3d 638, 641 (6th Cir. 2015) (active resistance includes a subject's refusal to move

his hands to allow the police to handcuff him and disobeying the orders of police officers).

"Moreover, a strong show of force, coupled with the threat to actually use it if necessary,

is sometimes the safest way to ensure that a potentially volatile situation does not erupt into

physical violence." Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988).

> The "reasonableness" of a particular use of force must be judged from the perspective of a
> reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . With
> respect to a claim of excessive force, the same standard of reasonableness at the moment
> applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a
> judge's chambers," (citation omitted)  violates the Fourth Amendment. The calculus of
> reasonableness must embody allowance for the fact that police officers are often forced to
> make split-second judgments -- in circumstances that are tense, uncertain, and rapidly
> evolving -- about the amount of force that is necessary in a particular situation.

Graham v. Connor, 490 U.S. 386, 396-97 (1989).  "[T]he court ultimately must determine

whether the totality of the circumstances justifies a particular sort of seizure." Martin v. City of

Broadview Heights, 712 F.3d 951, 958 (6th Cir. 2013)

Because the test is whether the use of force was objectively reasonable in the light of the

circumstances confronting Trooper Kennedy at the time, whether or not he had evil intentions is

irrelevant.  "An officer's evil intentions will not make a Fourth Amendment violation out of an

objectively reasonable use of force; nor will an officer's good intentions make an objectively

unreasonable use of force constitutional." Graham , 490 U.S. at 397.

### C.   Michael Kennedy Did Not Use Unreasonable Force.

#### 1.   The kicks used by Michael Kennedy during the handcuffing of J.H.

**were not an unreasonable use of force.**

The government asserts that Trooper Kennedy used unreasonable force (1) when he kicked J.H.'s legs before J.H. was handcuffed, (2) when he delivered 5 pain compliance strikes to J.H.'s upper back before J.H. was handcuffed, and (3) when he delivered 3 additional pain compliance strikes to J.H.'s upper back before J.H. was handcuffed.  This conclusion can only be reached by ignoring the circumstances at the time and the testimony of the other officers involved about what J.H. was doing.

First, J.H. had put the officers, and others, in danger by his high speed flight after hitting Deputy Merson's vehicle.  The officers were also put in danger when J.H.'s car hit a telephone pole and led to an explosion of a transformer.  These actions "set the stage" for what followed. Bazan v. Hidalgo County, 246 F.3d 481, 493 (5th Cir. 2001).

The fear of live wires on the ground was in the minds of Trooper Kennedy and Trooper Walker, who with Deputy Merson were the first to arrive on the accident scene.  These immediate threats to the safety of the officers and others and the flight to avoid arrest are two of the three factors to be considered when assessing the reasonableness of an officer's use of force. Graham v. Connor, 490 U.S. 386, 396 (1989).

Immediately after J.H. was pulled from his vehicle by Deputy Merson and Trooper Walker, Trooper Walker got on top of J.H, at his waist, Deputy Merson got down by the head of J.H. and Deputy Ennis ran to the scene and attempted to secure J.H.'s head.  Trooper Kennedy, meanwhile, went behind Trooper Walker and kicked at the legs of J.H.  Trooper Kennedy said he did this because he saw J.H. try to tuck his legs in an effort to get up.  What J.H. was doing cannot be seen on the video, because J.H. is lying almost perpendicular to the dashcam, and his

legs are hidden by the bodies of Deputies Merson and Ennis and Trooper Walker. [Gov.Ex. 2, at

2:45 to 3:00].  Trooper Walker said he did not know what was going on behind him at that time,

But Trooper Walker said that, when he was the only officer dealing with J.H., J.H. tried then to

"post up," that is, tried to get his legs under his body to stand up.  Trooper Kennedy suspected

that, given the 100-plus mile an hour chase, J.H. was likely making another effort to flee.

Trooper Kennedy said he was aiming at the nerve endings in J.H.'s knees in order to deaden

them.  According to police academy training materials, kicking techniques, use of pressure points

and manipulation of joints are permissible when a subject is trying to defeat the control of an

officer. [Gov.Ex. 6, p. 59-60].

Once Trooper Kennedy had the legs of J.H. straight out, he put his foot on the buttocks of

J.H. in order to pin his hips to the ground.

J.H. was actively resisting being handcuffed.  Because of the level of resistance put up by

J.H., Deputies Ennis and Merson each found it necessary to administer strikes to the upper body

and head of J.H.  All of this activity took place while officers were repeatedly telling J.H. to give

up and surrender his hands, which J.H. refused to do.  J.H.'s active resistence to arrest is another

factor showing the reasonableness under the circumstances of Trooper Kennedy's actions.

Graham v. Connor, 490 U.S. 386, 396 (1989).

In view of these circumstances, the government has not proved beyond a reasonable

doubt that the force used by Trooper Kennedy was unreasonable from the perspective of an

officer on the scene.

## 2.     The strikes to the back used by Michael Kennedy during the handcuffing of J.H. were not an unreasonable use of force.

The W.Va. Police Academy teaches that compliance strikes to large muscle groups, like

the shoulders, are a permissible use of force when a subject is pulling away from an officer or using his body to defeat the control of the officer. [Gov.Ex. 6, p. 59].

Trooper Kennedy and Deputies Ennis and Merson all were moving away from J.H., leaving Trooper Walker to finish the handcuffing. [Gov.Ex. 2, 3:05]. Trooper Walker had both of J.H.'s hands in his right hand, but neither was in cuffs. Trooper Kennedy turned back to J.H. and put his knee on J.H.'s back to pin him down. J.H. then pulled an arm away from Trooper Walker and began struggling, so Trooper Kennedy administered a series of five strikes to the upper back of J.H. [Gov.Ex. 2, 3:18]. The strikes had no apparent effect, as J.H. continued to struggle, and Trooper Kennedy administered three more strikes to the upper back of J.H. [Gov.Ex. 2, 3:24]. Trooper Walker then finished applying the handcuffs, and Trooper Kennedy stood up to move away.

Thus, the circumstances of the strikes involved a suspect who had fled an auto accident with a police cruiser at a high rate of speed, placing officers and others in danger, and who was actively resisting being handcuffed, who was pulling his arm away from the officer, who did not respond to verbal commands. "When a person engages in verbal and physical resistance to an arrest, he poses an immediate threat to officers." Sauceda v. City of San Benito, 2019 U.S. Dist. LEXIS 164095 (S.D. Tex. 2019), at *14.

Notably, Deputy Ennis, who observed the strikes, did not think Trooper Kennedy used too much force. Additionally, paramedic Brown did not report any bruising on the back of J.H., an indication that the force used by Trooper Kennedy was not excessive.

In view of these circumstances, the government has not proved beyond a reasonable doubt that the force used by Trooper Kennedy was unreasonable from the perspective of an

officer on the scene.

### 3. The "toss" of J.H. after the tripping of Trooper Walker was not an unreasonable use of force.

Once J.H. was handcuffed, Trooper Walker attempted to pick him up.  However, J.H. tensed up and jerked, tripping the trooper and sending both of them to the ground.  Trooper Kennedy saw the trip and assumed that J.H. was trying to flee.  Trooper Kennedy was the closest to J.H.  Deputy Merson was on the ground being tended to by Deputy Ritchie, Deputy Ennis had turned away from J.H., and Trooper Walker was on the ground from the trip. Trooper Kennedy, acting quickly, picked up J.H. by the shirt front, with his face close to the face of J.H., and carried him toward the side of the road away from Trooper Walker.  Then, feeling something wet hit his face, Trooper Kennedy reacted and pushed his arms outward and let go of J.H.  J.H., who was handcuffed behind his back, landed on his back in the grass. Deputy Kolb later saw a speck of blood on Trooper Kennedy's face.

Trooper Kennedy explained that by picking J.H. up and holding him off the ground, he was trying to intimidate J.H. and get him to stop struggling.  There is no indication that J.H. was caused any injury by the carry.

The video shows that Trooper Kennedy extended his arms outward while letting go of J.H. rather than throwing him down.  He said he remembered just dropping J.H., although the video shows him extending his arms outward like a toss.  Trooper Kennedy did not use any additional "pain compliance" measures on J.H. after dropping him.  He did talk to him.

Though while viewed afterward this "toss" may seem unreasonable, that is not the standard for judging Trooper Kennedy's actions.  This was a rapidly evolving situation.  J.H. had run at a high speed from the police officers; he had struggled against them in an effort to prevent

being handcuffed; then he tripped Trooper Walker; and finally apparently spit in Trooper

Kennedy's face.  Trooper Kennedy's reaction to the expectoration on his face was not, in that

instant, unreasonable.  This is an instance of a shove which may seem unnecessary, but in the

tense and uncertain circumstances of the evening was not unreasonable.  Graham v. Connor, 490

U.S. 386, 396-97 (1989).  The events which "set the stage" for the use of force must also be

considered.  Bazan v. Hidalgo County, 246 F.3d 481, 493 (5th Cir. 2001)

   Four points buttress this conclusion.  First, the various "pain compliance" methods used

by the deputies and troopers were of limited effect.  Second, it appeared to Trooper Walker, as

well as to Trooper Kennedy, that J.H. may have been making another attempt at fleeing.  Third,

after Trooper Kennedy released J.H. to the ground, J.H. for the first time offered no resistance.

Instead, J.H. lay still, a stillness which was not caused by any injury. Fourth, Trooper Kennedy

deposited J.H. in the grass off the side of the road, and not on the hard road surface.

   In view of these circumstances, the government has not proved beyond a reasonable

doubt that the force used by Trooper Kennedy was unreasonable from the perspective of an

officer on the scene.

    **4. The light slaps to the face of J.H. on the snowbank were not an**
      **<u>unreasonable use of force.</u>**

   Deputy Ennis helped Trooper Kennedy move J.H. further away from the smoking vehicle,

near the area where the ambulance would arrive, but off the road so he would not be run over.

Deputy Ennis then walked away, leaving Trooper Kennedy to tend to him.

   Trooper Kennedy stayed with J.H.  J.H. tried to get up several times, and Trooper

Kennedy pushed him down as he tried to get up and told him to stay down.  J.H. persisted.  So,

Trooper Kennedy slapped him twice on the face, taking care not to slap J.H. on the side of his

face which was injured.  Deputy Ennis described these as light slaps.  Deputy Ennis and Deputy Kolb each said he could see the necessity for the slaps.  Trooper Kennedy said he was trying to break through to J.H., and get him to stop resisting.

The government argued that Trooper Kennedy should have put J.H. in his cruiser. Trooper Kennedy gave several reasons why he did not do that.  His cruiser was some distance away, J.H. was not his arrest and he was waiting for a deputy to take custody of J.H.  There was no cage in his cruiser, so he would have had to stay with J.H. because, as Trooper Walker testified, there are weapons in the cruiser of a State Trooper.  Instead, after subduing J.H. on the snowbank, he disengaged and had no further contact with J.H.

In view of these circumstances, the government has not proved beyond a reasonable doubt that the force used by Trooper Kennedy was unreasonable from the perspective of an officer on the scene.

**5.      Trooper Kennedy Purposefully Restricted his Use of Force so as not to cause real injury to J.H.**

At all times, Trooper Kennedy used force in a measured way in an effort to get J.H. to stop resisting arrest and to assure that J.H. did not attempt to flee.  His kicks were aimed at J.H.'s knee area, and not at J.H.'s groin or other area which would have caused considerable pain, and possibly injury, to J.H.  Trooper Kennedy wanted to stop J.H. from pulling his legs under his body so he could try to stand up.  When that threat of escape ended, Trooper Kennedy stopped his kicks.

Trooper Kennedy used compliance strikes only when J.H. renewed resistance to being handcuffed by Trooper Walker.  When J.H. became handcuffed, Trooper Kennedy stopped the strikes.  The strikes were to the upper back muscles of J.H.  Trooper Kennedy did not hit J.H. in

the head or the neck, areas which would have caused considerable pain, and possibly injury, to J.H.

When, in reaction to J.H. either purposefully or inadvertently expectorating on him, Trooper Kennedy tossed J.H. backward, he let go of him on the grass and not on the hard surface of the road.  Trooper Kennedy did not throw him down hard on the ground, but, as the video shows when viewed in slow motion, instead put his arms forward and let go of J.H.  No one observed any injury to J.H. from this action.

Finally, at the snowbank, when Trooper Kennedy slapped J.H. lightly, twice, he took care to avoid hitting J.H. on the side of his face which had been injured.

In sum, at all times, even in the tense situation presented by the chase and the accident, Trooper Kennedy took care not to cause harm to J.H.  He never used, or even threatened to use, any weapon or spray on J.H. Instead, he only did what was reasonably necessary to gain and keep control of a suspect who had demonstrated a propensity to flee and who resisted arrest.

### D.     The Wilfulness Element.

Even if any of Trooper Kennedy's uses of force were unreasonable, there is no violation of the statute unless he acted "willfully." 18 U.S.C. § 242.

The term "willfully" does not mean merely that Trooper Kennedy meant to do what he did.  Rather, as used in the statute, "willfully" means "not merely a conscious purpose to do wrong, but a specific intent to deprive [J.H.] of a right." United States v. Ramey, 336 F.2d 512, 515 (4th Cir. 1964), citing Crews v. United States, 160 F.2d 746, 749 (5th Cir. 1947); Williams v. United States, 341 U.S. 97, 102 (1951).  The Fourth Circuit restated this definition in United States v. Mohr, 318 F.3d 613, 618-19 (4th Cir. 2003), where it said that willfully means "with 'the

particular purpose of violating a protected right made definite by the rule of law' or 'recklessly disregarding the risk' that [he] would do so."

When making the determination of whether Trooper Kennedy acted willfully, the Court must consider "all the attendant circumstances; the malice, if any, of the defendant[] toward [J.H.]; the weapon used in the assault, if any; and the character and duration of the investigation, if any, of the assault, if any, and the time and manner in which it was carried out." Williams v. United States, 341 U.S. 97, 102 n.* (1951).

### 1. Michael Kennedy did not wilfully deprive J.H. of his constitutional right to be free from unreasonable seizure.

One means of showing that Trooper Kennedy acted willfully is evidence that he previously acted in a similar manner in a similar situation. United States v. Mohr, 318 F.3d 613, 618 (4th Cir. 2003). There no evidence of any prior undue use of force by Trooper Kennedy.

The evidence does not support a finding that Trooper Kennedy acted either with the particular purpose of violating a protected right made definite by the rule of law or recklessly disregarding the risk that he would do so.

The kicks and strikes to the knee joint used by Trooper Kennedy are within the guidelines taught by the W.Va. Police Academy. [Gov.Ex. 6, p. 59-60]. When Trooper Kennedy thought he had stopped J.H.'s ability to get his legs under his body to get up, Trooper Kennedy stopped his use of force on the legs.

The strikes to the upper back which Trooper Kennedy administered to J.H. are within the guidelines taught by the W.Va. Police Academy. [Gov.Ex. 6, p. 59]. When administering the strikes, he took care to shield the head of J.H. from any glancing blows. Trooper Walker's testimony shows that the strikes were in response to the efforts of J.H. to avoid being handcuffed.

No officer on the scene thought Trooper Kennedy was using excessive force.

The carry by the shirt front was in reaction to an apparent attempt by J.H. to escape from Trooper Walker. It caused no injury of any kind to J.H., but was a non-violent effort to stop J.H. from further resistance.

The "toss" of J.H. was a heat of the moment reaction to what J.H. did. The reaction came after the high speed car chase, the exploding transformer, the resistance to being handcuffed and the trip of Trooper Walker. Trooper Kennedy did not intend to cause harm to J.H., and caused none.

Deputy Ennis and Trooper Kennedy moved J.H. to the snowbank to get him farther away from the smoking, wrecked vehicle and closer to the ambulance pick up point. This indicates concern for J.H.

The slaps at the snowbank were a reaction to J.H.'s renewed efforts to stand up and, presumably, flee. They were light slaps. Trooper Kennedy took care not to slap J.H. on the side of his face which was injured, again indicating concern for the well-being of J.H.

Throughout this incident, it was Trooper Kennedy who acted to keep a suspect who had shown a propensity to flee and who continuously resisted the police under control, while other officers walked away to gather themselves or to tend to the injured Deputy Merson.

In sum, the government has failed to prove beyond a reasonable doubt that Trooper Kennedy acted wilfully to deprive J.H. from his constitutional right to be free from unreasonable seizure.

### E.   The Bodily Injury Element.

In order to prove the "bodily injury" element which turns the charge against Trooper

Kennedy into a felony, the government must prove beyond a reasonable doubt not only that JH suffered an injury, but that the injury "resulted directly and only from a use of force [by Trooper Kennedy] that was clearly excessive." Ontiveros v. City of Rosenberg, 564 F.3d 379, 382 (5th Cir. 2009); United States v. Brugman, 364 F.3d 613, 616 (5th Cir. 2004).  That is, the government must prove beyond a reasonable doubt that J.H. suffered a specific injury as a result of specific conduct of a defendant, and an affirmative link between the injury and that conduct. Rizzo v. Goode, 423 U.S. 362, 371-72 (1976).  The government must present proof of causation between the conduct of Trooper Kennedy and the alleged injury to J.H.  Walsh v. Berkebile, Civil Action No. 5:10-0463, 2011 U.S. Dist. LEXIS 43914, at *10-11 (S.D. W. Va. Feb. 22, 2011) (involving a Bivens claim).

"Bodily injury" under the statute includes, among other things, abrasions, bruises and physical pain, even if only temporary.  United States v. Bailey, 405 F.3d 102, 111 (1st Cir. 2005).

### 1.    There is no evidence that any bodily injury incurred by J.H. was caused by Michael Kennedy.

The record is absent of any evidence that Trooper Kennedy caused any bodily injury to J.H.  Paramedic Brown said that J.H. complained only of a headache and of handcuffs being too tight.  Mr. Brown said the headache was consistent with the aftermath of an automobile accident. Trooper Kennedy did not put the handcuffs on J.H.  In any event, Mr. Brown said that the handcuffs did not cause any issue.

Mr. Brown also said that J.H. told him that, other than the headache, he felt no pain.  J.H. did not testify, so there is no evidence that he was in any pain at any time after the night of the accident.

J.H. suffered abrasions on the left side of his face.  However, the video clearly shows that

**Page 36 of 38**

those injuries were incurred before Trooper Kennedy came anywhere near the head of J.H. [Gov.Ex. 2, 3:01-3:03].  There are several possible sources of those injuries, none involving Trooper Kennedy.  The injuries could have occurred in the accident, or when J.H. hit the ground on his left side after being pulled through the window of his vehicle, or when Deputy Merson administered a knee strike to the head of J.H. while J.H. was on the ground, or when one of the deputies kicked J.H. on his left upper torso.

Mr. Brown also found contusions on the left arm and hip of J.H.  Those, however, were likely caused either in the auto accident, or when J.H. landed on the ground on his left side after being pulled through the driver's side window of J.H.'s wrecked vehicle.

The government has not proved beyond a reasonable doubt that Michael Kennedy caused by use of excessive force any bodily injury to J.H.

### III.  CONCLUSIONS OF LAW

1.     Defendant Michael Kennedy was acting under the color of law during his engagement with J.H. on the night of November 18-19, 2019.

2.     The government has not proved beyond a reasonable doubt that Michael Kennedy used unreasonable force to deprive J.H. of his constitutional right to be free from unreasonable seizure.

3.     The government has not proved beyond a reasonable doubt that Michael Kennedy acted willfully to deprive J.H. of his constitutional right to be free from unreasonable seizure.

4.     The government has not proved beyond a reasonable doubt that Michael Kennedy caused bodily injury to J.H. by the use of excessive force.

5.     Michael Kennedy is entitled to entry of a judgment of acquittal of the sole charge

of the indictment, violation of 18 U.S.C. § 242.

Respectfully submitted,

Counsel for Defendant Michael Kennedy

B. Craig Manford (W.Va. Bar #2307)
151 N. Queen St.
P.O. Box 3021
Martinsburg, WV 25402
Voice: (304) 263-5698
Email:  byronman@aol.com

Garry G. Geffert (W.Va. Bar #1362)
Attorney for Defendant
114 S. Maple Ave.
P.O. Box 2281
Martinsburg, WV 25402
Voice: (304) 262-4436
Facsimile: (304) 596-2474
Email: geffert@wvdsl.net

By:  /s/ Garry G. Geffert

**CERTIFICATE OF SERVICE**

I CERTIFY that I have this 25th  day of October, 2019, filed this document with the Clerk

of the Court using the CM/ECF electronic filing system which will then send a notice of this

filing to all counsel of record.

/s/ Garry G. Geffert