**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**MARTINSBURG**

**UNITED STATES OF AMERICA,**

       Plaintiff,

**v.**                                                                 **CRIMINAL ACTION NO.: 3:19-CR-29**
                                                                      **(GROH)**

**MICHAEL KENNEDY,**

       Defendant.

## <u>ORDER OF BENCH TRIAL</u>

In the United States, every individual has a constitutional right to be free from the use of unreasonable force by one acting under color of law.  Every individual charged with a criminal offense has a constitutional right to a fair, public trial before an impartial jury and a fundamental right to be presumed innocent until proven guilty.

On March 20, 2019, an indictment charged Michael Kennedy, a former West Virginia State Police trooper, with one count of deprivation of rights under color of law, in violation of 18 U.S.C. § 242.  ECF No. 1.  Specifically, the indictment alleges

> [o]n or about November 19, 2018, in Berkeley County, West Virginia, within the Northern District of West Virginia, the defendant, Michael Kennedy, while acting under color of law, physically assaulted J.H., a person known to the Grand Jury, during his arrest, and thereby willfully deprived J.H. of the right, secured and protected by the Constitution and laws of the United States, to be free from unreasonable seizures, which includes the right to be free from the unreasonable force by one acting under color of law.  As a result of the defendant's actions, J.H. suffered bodily injury.

<u>Id.</u>

In this case, the Defendant was deprived of his right to be tried before a jury due to inappropriate pretrial publicity[1] which the parties and Court agreed unfairly hampered the Defendant's ability to impanel an impartial jury.

The day after the Defendant was indicted, the Berkeley County Prosecuting Attorney improperly[2],[3] released a police cruiser dashboard camera video of the scene of the alleged offense and issued a press release describing what the video purportedly showed.[4]   Thereafter, the case received widespread news media and social media

---

[1] While the Court recognizes a public interest in viewing video evidence of alleged law enforcement misconduct, this public interest cannot override the constitutional rights of an individual charged with the commission of a criminal offense.  Moreover, if an individual proceeds to trial, the individual is tried in an open public courtroom.  Therefore, interested members of the public may attend for observation.

[2] While the press and public are free to distribute information as they see fit, every attorney, as an officer of the Court and member of the bar, is ethically constrained from making public statements which may prejudice a defendant.  Rule 3.6(a) of the West Virginia Rules of Professional Conduct prohibits any lawyer who "has participated in the investigation . . . of a matter" from making "an extrajudicial statement that the lawyer knows or reasonably should know will be disseminated by means of public communication and will have a substantial likelihood of materially prejudicing an adjudicative proceeding in the matter."  W. Va. R. Prof. Conduct 3.6(a).

[3] Any attorney who serves as a prosecutor is a "minister of justice," and has additional ethical duties to protect the rights of criminal defendants.  See id. at 3.8, Special Responsibilities of a Prosecutor, Comment 1.  Rule 3.8(f) specifically prohibits a prosecutor "from making extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused and exercise reasonable care to prevent . . . employees or other persons assisting or associated with the prosecutor in a criminal case from making an extrajudicial statement the prosecutor would be prohibited from making under Rule 3.6 or this Rule."  Id. at 3.8(f).

[4] See e.g., MetroNews Staff, Video of state trooper beating of suspect released, METRONEWS: THE VOICE OF WEST VIRGINIA (March 21, 2019, 11:48 PM) http://wvmetronews.com/2019/03/21/video-of-state-trooper-beating-of-suspect-released/ ("Berkeley County prosecuting attorney Catie Wilkes-Delligatti said the video shows Berkeley County Sheriff's Deputy C.S. Merson approaching the vehicle with Trooper Walker behind him.  Merson breaks the window out of the vehicle because the door handle was broken in the accident and the door would not open.  Merson and Walker pull the juvenile driver from the vehicle through the window.  Trooper Kennedy next approaches followed by Deputy Austin Ennis.  The video then shows the police trying to handcuff the suspect.  At one point, Trooper Kennedy begins kicking the suspect.  Eventually they subdue him, but then Kennedy approaches the suspect and repeatedly strikes him in the face.  Later, after the suspect is on his feet, Kennedy tosses him to the ground."), see also John Raby, Video Shows Teen's Beating During West Virginia Traffic Stop, U.S. NEWS & WORLD REPORT (March 21, 2019, 2:47 PM) https://www.usnews.com/news/us/articles/2019-03-21/video-shows-teens-beating-during-west-virginia-traffic-stop; Enjoli Francis and Susan Schwartz, Police dashcam video released showing West Virginia officers allegedly beating 16-year-old after chase, ABC NEWS (March 21, 2019, 7:05 PM) https://abcnews.go.com/US/police-dashcam-video-released-showing-west-virginia-officers/story?id=61848815.

attention.[5]  Presumably, this case, along with the reputations of the juvenile and all law enforcement officers shown on the video, has already been tried on the media stage by public opinion based upon the released video and statements of people who were not present at the scene of the alleged offense. Upon this basis, the Court granted the Defendant's motion, with the Government's consent, to try this case before the Court instead of a jury.[6]

For two days, on October 7, 2019 and October 8, 2019, the Government, by Assistant United States Attorney Jarod J. Douglas and Department of Justice Trial Attorney Christine M. Siscaretti, and the Defendant, in person, and by attorneys B. Craig Manford and Garry G. Geffert, appeared for a trial before this Court. The Court gave careful and impartial consideration of (1) the applicable law; (2) the testimony of all of the witnesses, including every person who was at the scene of the alleged offense, except for Deputy Merson and the juvenile who did not testify; (3) all of the documents entered into evidence; (4) dash camera video recordings of the alleged offense which were played in slow motion and had been enhanced by FBI technology to make the images larger; (5) the arguments of counsel and (6) counsel's proposed findings of fact and conclusions of law—which the Court ordered to be filed upon conclusion of the trial to allow the parties every opportunity to present their cases to the Court.

---

[5] See ECF No. 19 ("the Court advised the parties that it too was concerned about being able to empanel an impartial jury since this case had received widespread press coverage following the release of the video").

[6] See ECF No. 53 (granting the motion for bench trial "on the basis that the parties, as well as the Court, continue to have concerns about being able to empanel an impartial jury since this case received widespread press coverage following the release of the video of the charged conduct by the Berkeley County Prosecuting Attorney's Office after the Defendant was indicted in this case").

## I.  FACTUAL BACKGROUND

The facts upon which the Court's decision is based are set forth in order of the testimony presented.

The Government's first witness was Luther Brown Jr., a paramedic with the Berkeley County Emergency Ambulance Authority who reported to the scene of the alleged offense. When Mr. Brown arrived at the scene, J.H.[7] was handcuffed and sitting on the ground.  Mr. Brown noticed J.H. was bleeding on the left side of his face, but he did not immediately notice any other injuries.  J.H. informed Mr. Brown he had been in a car wreck and he was currently suffering from a headache.  J.H. also informed Mr. Brown he woke up in the passenger seat of the vehicle, which caused Mr. Brown to believe J.H. was not wearing a seatbelt and had possibly suffered a concussion.  J.H. told Mr. Brown he was tossed on the ground, but that was the extent of the conversation.  When Mr. Brown removed J.H.'s shirt, he found contusions on J.H.'s left hip and left elbow, injuries Mr. Brown stated were consistent with other patients he had seen in similar car accidents. When Mr. Brown asked J.H. how much pain he was in, J.H. indicated he was not experiencing any pain, but he had a headache and his handcuffs were too tight.  J.H. was frustrated because he was handcuffed.  Mr. Brown assessed the handcuffs and found there was plenty of room and the handcuffs were not cutting off J.H.'s circulation.

The Government's second witness was Andrew Galotti, a supervisory electronics engineer with the FBI.  Mr. Galotti was called as a witness by the Government to explain how he magnified the dash camera video evidence.  His testimony was not relevant for other purposes of the Court's decision.

---

[7] Mr. Brown described J.H. as a sixteen-year-old male, approximately five-feet and eight-inches tall and weighing approximately one-hundred and forty pounds.

The Government's third witness was Ryan Kolb, who has served as a deputy for the Berkeley County Sheriff's Office since December of 2017 and graduated from the West Virginia State Police Academy on June 20, 2018.  Just after midnight on November 19, 2018, Deputy Kolb responded to a call at Jack Rabbit's bar.  After he arrived in the parking lot, he heard a car crash.  Deputy Kolb realized someone rear-ended Deputy Merson's patrol car.  J.H., the driver who rear-ended Deputy Merson's patrol car, fled the scene, driving north on Williamsport Pike.[8]  Deputy Merson, Deputy Kolb and the other officers at the scene of the accident pursued the vehicle in a high-speed chase.  Deputy Kolb made a wrong turn during his pursuit.  Therefore, he was not present at the time of J.H.'s car crash.  However, Deputy Kolb heard Deputy Merson report the car crash over the radio and arrived at the scene within a few minutes.[9]  Deputy Merson, Deputy Ennis, Deputy Ritchie, Trooper Walker and the Defendant were already at the scene of the car crash when Deputy Kolb arrived.

Deputy Kolb testified he saw Deputy Merson lying on the ground in pain.  He further saw the Defendant moving J.H.,[10] who was handcuffed, from in front of Deputy Merson's patrol vehicle to a snowbank[11] off the road.  According to Deputy Kolb, J.H. was being moved because he would be more accessible to the medics who were on their way if he was by the snowbank.  He did not notice J.H. was suffering from any physical injuries, but

---

[8] Williamsport Pike may also be referred to as Route 11 throughout the Court's opinion.

[9] Deputy Kolb described J.H.'s crashed vehicle as "totaled" and "mangled."  Trial Tr. vol. 1, 31:15-16.

[10] At trial, Deputy Kolb described J.H. as "small," weighing approximately one-hundred pounds.  However, he previously testified before the grand jury that J.H. weighed approximately one-hundred and twenty pounds.  Id. at 31:20-22.

[11] Deputy Kolb described what he and other officers referred to as a snowbank to be a four-foot pile of snow.  The Court's review of the dash camera video footage shows there is snow on the ground, but the depth of the snow cannot be ascertained.

J.H. did have blood all over his face.  Deputy Kolb testified that from where he was standing, he did not see J.H. resisting while the Defendant was moving him.

Once J.H. was at the snowbank, Deputy Kolb heard the Defendant and J.H. talking loudly to one another and he saw the Defendant use his hand to slap J.H. in the face.  At trial, Deputy Kolb could not recall what the Defendant said to J.H. However, after reviewing his grand jury testimony, he recalled the Defendant telling J.H.  he could have paralyzed Deputy Merson from the accident.  After the Defendant slapped J.H. in the face, Deputy Kolb saw blood on the Defendant's face.  Deputy Kolb told the Defendant and the Defendant wiped it off his face.  Deputy Kolb testified he was approximately two or three feet from the Defendant and J.H. during this encounter.

Deputy Kolb further testified he did not believe J.H. was posing a threat or resisting, but he said there was absolutely a reason to believe J.H. might flee.  Deputy Kolb did not see any reason for the Defendant to slap J.H. in the face with his hand.  However, Deputy Kolb also testified J.H. tried to sit up more than four or five times by lifting his torso off the ground and the Defendant pushed J.H. back down telling him to be compliant and to quit resisting while the ambulance was on the way.  Deputy Kolb testified a suspect trying to get up like J.H. could cause concern because he may try to get up to escape or to strike an officer.  However, he also testified this was not a reason to use force against a suspect.  Finally, Deputy Kolb testified while he would not have used force, if he felt the Defendant's use of force was completely overboard, he would have stepped in.

The Government's fourth witness was Captain David Lee.  Captain Lee is currently the director of training at the West Virginia State Police Academy.  Captain Lee was also serving as the director of training when the Defendant completed the academy class in

May of 2012.   Captain Lee testified the Defendant attended a use of force lecture, defensive tactics training and scenario-based training at the Academy.   The use of force lecture covered pain compliance techniques, which are used to insert pain on an individual to gain compliance.   Captain Lee testified pressure points, joint locks, pepper spray, a taser and closed-hand strikes to muscle groups could all be used as pain compliance techniques.   Captain Lee also discussed factors an officer could take into consideration before using force, including age, size, the number of subjects and the number of officers.

The Government's fifth witness was Austin Ennis, a deputy with the Berkeley County Sheriff's Office who graduated from the West Virginia State Police Academy in July of 2016.   Deputy Ennis also responded to the call at Jack Rabbit's bar just after midnight on November 19, 2018.   Deputy Ennis was outside of his patrol car when he saw Deputy Merson head northbound on Route 11 with his lights and sirens on.   He joined in the high-speed pursuit.   Deputy Ennis heard Deputy Merson state the car had crashed over the radio.   He arrived on the scene approximately half a minute after he saw a bright light in the sky caused by the explosion of the transformer on the telephone pole J.H. crashed into.

Deputy Merson, Trooper Walker and the Defendant were already on the scene when Deputy Ennis arrived.   He saw J.H. on the ground and the officers around him. Deputy Merson was at J.H.'s head and Trooper Walker and the Defendant were at the lower parts of J.H.'s body.   As Deputy Ennis was approaching the other officers and J.H., he heard verbal commands for J.H. to give himself up, meaning to stay still and keep his hands visible.   He noticed J.H. had a laceration on his head.   Deputy Ennis engaged at

J.H.'s head area.  When he began to engage he noticed a level of resistance, so he got down to his knees and attempted to assist.  Deputy Ennis was focusing on J.H's head and shoulder area to immobilize J.H.  Deputy Ennis testified "[a]fter observing resistance, [he] executed closed-hand strikes to [J.H.]" to gain compliance.  Trial Tr. vol. 1, 106:6-7.  Deputy Ennis could feel J.H. tensing up and turning his head.  He explained one cannot necessarily see resistance, but one can feel it.  Deputy Ennis "remember[ed] him saying something along the lines of, you know, get off of me as well as he had a hand tucked underneath of his body which [they] weren't able to get secured at that point."  Id. at 9-12.  Therefore, Deputy Ennis executed an additional strike in what he explained was an attempt to gain compliance.

Eventually, when Deputy Ennis saw Deputy Merson standing up complaining his back was hurting, Deputy Ennis stood up because he assumed J.H. was handcuffed and not resisting any longer.  His assumption turned out to be incorrect.  After Deputy Ritchie arrived on the scene, Deputy Ennis momentarily walked away because he needed to gather himself and wind down from what he described as a "pretty intense situation."  Id. at 110:1.

Thereafter, Deputy Ennis saw the Defendant deliver additional strikes to J.H., but he did not see any resistance.  Deputy Ennis testified if J.H. was tensing up he would not have been able to see it.  He walked back over to Trooper Walker, the Defendant and J.H. because he saw force being used and wanted to see if his assistance was needed.  Deputy Ennis did not see a reason for himself to use force and he did not see any resistance.  Deputy Ennis also testified he, himself, did not see any reason for the Defendant to be striking J.H. in the back, but he could not tell if it was necessary or not

because he was not engaged in the use of force.  Deputy Ennis walked away from the situation again.

Deputy Ennis then saw Trooper Walker try to pick J.H. up and fall to the ground. He did not see if there was resistance by J.H. at this time.  After the fall, the Defendant picked J.H. up and began to move him and Deputy Ennis was walking along with the Defendant.  He heard the Defendant speaking to J.H. in a raised voice while moving him, but he did not characterize it as an angry tone.  When asked about the manner in which the Defendant moved J.H., Deputy Ennis stated he understood why J.H. was moved. However, he stated without talking to the Defendant he could not say whether it was necessary or not for him to move J.H. by the shirt collar as described by the Government's counsel.  Deputy Ennis testified it is not the way he would have moved J.H.  When asked if he saw "any reason for Trooper Kennedy to toss the subject to the ground," Deputy Ennis responded he "didn't see it, no."  Id. at 115:11-13.  After J.H. was tossed to the ground, J.H. was just lying there and was not resisting.  Deputy Ennis walked away from the situation again to wind down and because he did not feel his assistance was needed.

Eventually, Deputy Ennis returned to where the Defendant and J.H. were because the Defendant picked J.H. up to move him again.  Deputy Ennis helped move J.H. to a spot by the roadside on Route 11.   J.H. refused to walk so Deputy Ennis and the Defendant had to carry him.  They placed J.H. on the snow.  When the Government's counsel asked Deputy Ennis about placing J.H. on the snow, Deputy Ennis testified he "didn't think anything of it."  Id. at 117:25-118:2.  While J.H. was on the ground, the Defendant brought J.H.'s face towards his and was speaking to him.  Deputy Ennis remembers the Defendant saying something like "you could have hurt this officer" in an

angry, raised voice.  Id. at 120:13-14.   The Defendant was referring to Deputy Merson. Deputy Ennis testified he was a couple of feet away from the Defendant and J.H. at this point, and he saw J.H. continuously try to get up and raise his body off of the ground.  He believes J.H. was attempting to stand up.  He heard the Defendant telling J.H. to stay down and he saw the Defendant use an open-hand strike to force J.H. back down to the ground.  Deputy Ennis described this force as a light strike to the right side of J.H's face. J.H. was handcuffed during the Defendant's use of force.

Deputy Ennis saw a reason for force to be used. He testified the force did not appear to him as excessive, just perhaps more than he would have used himself.  Deputy Ennis did not see anything which made him think he needed to intervene and stop the Defendant and it never crossed his mind to report the Defendant to a higher authority.

The Government's sixth witness was David Ritchie, who has served as a deputy with the Berkeley County Sherriff's Department for four years.  Deputy Ritchie was also at Jack Rabbit's bar when Deputy Merson's patrol car was rear-ended.  He did not see or hear the crash, but the Defendant told him Deputy Merson's patrol car had been rear-ended.  Deputy Ritchie saw Deputy Merson head northbound on Route 11 at a high speed in pursuit of J.H., so he followed the pursuit. He heard Deputy Merson on the radio report J.H.'s car had crashed.   Deputy Merson, Deputy Ennis, Trooper Walker and the Defendant were already on the scene when Deputy Ritchie arrived.  When he arrived, he saw "the top of a couple of the officers' heads" and he could "hear the officers' yelling." Id. at 148:2-3.   At this point, J.H.'s wrecked vehicle[12] was between Deputy Ritchie and everyone else so he could not see what was going on.  When he got around the vehicle,

---

[12] Deputy Ritchie testified that J.H.'s vehicle had "spun around and was facing back towards Route 11."  Id. at 148:12-14.

the officers were standing up.  J.H. was lying face down on the ground and Trooper Walker was still down with a knee on J.H.  Deputy Ritchie said "it appeared that Trooper Walker was just holding [J.H.'s] hands behind his back."  Id. at 149:10-11.  He noticed lacerations on J.H.'s face, which appeared to be from the traffic accident.

Next, Deputy Ritchie recalls Deputy Ennis and Deputy Merson moving off to the right from where he was standing.  The Defendant and Trooper Walker were with J.H., but Deputy Ritchie did not believe his assistance was needed.  He walked over to Deputy Merson to inquire about what had happened.  While he was speaking to Deputy Merson, the Defendant had his knee on J.H.'s back.  Deputy Ritchie remembered seeing sudden movement from J.H. followed by the Defendant delivering strikes to J.H.'s back area.  Deputy Ritchie did not believe his assistance was needed at this time.  Deputy Ritchie did not remember seeing the second set of strikes delivered.  He also did not hear any of the officers talking.

The next thing Deputy Ritchie remembered was Trooper Walker trying to pick J.H. up.  Then, Trooper Walker either tripped over his feet or he was somehow tripped onto the ground.  Deputy Ritchie testified after Trooper Walker fell, the Defendant picked J.H. up by his shirt and lifted him off the ground.  When the Defendant picked J.H. up, J.H. was lying on the ground, handcuffed behind his back.  Deputy Ritchie did not see a reason for the Defendant to pick J.H. up in that manner.  The next thing Deputy Ritchie remembered was glancing over and seeing J.H. lying on the ground in the grass area just to the right of the roadway.  He then observed smoke coming from J.H.'s vehicle so he wanted to move Deputy Merson in case the vehicle was on fire.  The Defendant and J.H. were approximately five to eight feet away from Deputy Ritchie and Deputy Merson.

Deputy Ritchie did not hear the Defendant say anything to J.H.  However, at some point Deputy Ritchie looked up and J.H. had moved to another location.  J.H. was now fifteen to twenty feet behind him.  J.H. was still handcuffed and he was lying face down[13] on a pile of snow.  Deputy Ritchie testified he did not see any additional injuries on J.H., only the ones he had previously seen.  At some point he heard the Defendant yelling at J.H., but he did not hear what the Defendant was saying or see what was going on because he was focused on making sure Deputy Merson was okay.

The Government's seventh witness was Derek Walker, who served as a West Virginia State Police trooper for eight years prior to the events which occurred on November 19, 2018.  Trooper Walker responded to the call at Jack Rabbit's bar around midnight and saw Deputy Merson's patrol car get rear-ended.  Trooper Walker was the first car behind Deputy Merson's in the pursuit.  Trooper Walker's vehicle was traveling between ninety and one-hundred and ten miles per hour during the pursuit to try to catch up with J.H.'s vehicle. Trooper Walker saw J.H.'s car go off the side of the road, cross back across the road, spin around and hit a telephone pole.

When Trooper Walker exited his patrol car, there was a lot of smoke coming from the vehicle, making it hard for Trooper Walker to see.  As the smoke started to clear, Trooper Walker and Deputy Merson directed J.H. to exit the vehicle.  Trooper Walker could then see J.H. was facing them and he "was conscious and alert and was just staring at [them] as [they] were giving him commands to get out of the vehicle."  Id. at 186:14-15. Trooper Walker could not recall J.H. having any injuries at this time, J.H. moving or where J.H.'s hands were.  After Deputy Merson broke the car window, the Defendant arrived on

---

[13] Deputy Ritchie stated J.H. was lying face down on the snow as opposed to face-up.  None of the other officers testified J.H. was ever lying face down in the snow.

the scene.  Then, Trooper Walker pulled J.H. out of the driver's side window.  J.H. was placed under arrest and was going to be handcuffed.  Trooper Walker recalled J.H. being "on his left side and maybe belly down in between those positions" and Trooper Walker was holding J.H.'s right hand.  Id. at 188:23-25.  J.H. was "trying to tuck his arms up underneath of his body."  Id. at 189:4.

Deputy Ennis then arrived on the scene and was on his knees by J.H.  Trooper Walker was trying to get J.H.'s arm behind J.H.'s back to handcuff him, but J.H. was resisting and trying to pull his arms underneath his body.  Trooper Walker tried to maintain a hold of J.H.'s right hand, but J.H. broke his grip a couple of times.  At this time, the Defendant struck J.H. in the back with his foot.  Trooper Walker testified he was focused on his own actions and getting J.H. handcuffed so he did not see the Defendant's strikes.  Trooper Walker had both of J.H.'s hands and was trying to handcuff him when he heard Deputy Merson complain of back pain and step away from J.H.  The Defendant "placed his knee on the back of [J.H.] to hold him down to the ground because he had just been resisting [them]."  Id. at 193:16-18.  Initially, Trooper Walker was able to hold both of J.H.'s hands with one of his to get his handcuffs out, however, when he was about to handcuff J.H., J.H. broke Trooper Walker's grip and tried to put his hands in front of him.  Trooper Walker had to yank J.H.'s hands back with force to get his hands under control.  Trooper Walker testified J.H. was still tensing up the entire time, and if he had let go of J.H.'s hands they would have moved.  J.H. moved his right arm again which Trooper Walker stated "looked like an attempt to bring the arm back out where he just broke [Trooper Walker's] grip."  Id. at 195:15-17.  Then, Trooper Walker testified the Defendant delivered five compliance strikes to the muscle area of J.H.'s back.  Trooper Walker had his hands

on J.H.'s hands, but they were still not under control.  Trooper Walker got the right hand

handcuffed, but needed to get the left hand handcuffed.  The Defendant readjusted J.H.'s

arm so Trooper Walker could get a hold of it.  While Trooper Walker was in the process

of handcuffing J.H. and J.H. was moving his arm, the Defendant struck J.H. three more

times.  Trooper Walker testified if J.H. had not been tensing up, it would have only taken

one officer to handcuff him.

After Trooper Walker got J.H. handcuffed he noticed blood running down the left

side of J.H.'s face.  When defense counsel asked if the Defendant had touched or struck

J.H. in any way other than having his knee on his back and kicking his back at the time

J.H had blood coming from the left side of his face, Trooper Walker responded "not that I

had seen or after watching the video."  Id. at 205:1-4.

Trooper Walker picked J.H. up to try to move him, but J.H. tensed his entire body

up and jerked, causing Trooper Walker to lose his footing.  Trooper Walker tripped and

fell to the ground.  Trooper Walker did not see the Defendant move the suspect after

Trooper Walker fell.  Trooper Walker was upset because J.H. had just made him fall to

the ground, so he walked away and went to search J.H.'s car.  Trooper Walker did not

see any further contact between the Defendant and J.H.  Defense counsel asked Trooper

Walker if the situation was tense and if he was concerned about his safety and the safety

of his fellow officers.  Trooper Walker responded "absolutely" to both questions.  Id. at

202:15-19.

The Government's eighth witness was Willy Johnson, an administrative captain

with the Berkeley County Sheriff's Department.  Captain Johnson was not at the scene of

the crash on November 19, 2018 when the use of force occurred, but reported to the

scene after the events occurred as part of his job duties as a traffic accident reconstructionist.  Captain Johnson only surmised what happened at the scene based on his viewing of the dash camera video footage after the events occurred.  He testified when he started watching the video, "it appeared to [him] that something was there on the ground, and they were striking it so [he] notified the sheriff."  Id. at 221:11-12.  Captain Johnson clearly could not identify what was on the ground or who was striking J.H.  Captain Johnson testified that he thought it was "a big bag of garbage being tossed all over the ground."  Id. at 222:11-12.  When the Court viewed the dash camera video evidence, it clearly showed a white male on the ground in the video.  Contrary to Captain Johnson's testimony, the Court also saw J.H. tossed once, not all over the ground.  Captain Johnson further testified "everybody [was] standing by this white ground and striking at the ground."  Id. at 222:3-5.  Contrary to Captain Johnson's testimony, the evidence showed not everybody at the scene was simultaneously striking J.H. or the "white ground" which the Court presumes was the snowbank.  Captain Johnson's account of what occurred was an inaccurate depiction of what the video showed and testimony described, leading the Court to conclude Captain Johnson was either totally mistaken about what he saw or was sensationalizing his testimony.  In either event, the Court gives Captain Johnson's testimony no weight or credibility.

Finally, for the Defendant's case-in-chief, Defendant Michael Kennedy testified.  The Defendant was approaching his eighth year as a West Virginia State Police trooper when the events occurred on November 19, 2018.  The Defendant reported to Jack Rabbit's bar around approximately midnight on this date.  He saw J.H. rear-end Deputy Merson's patrol car and drive off.  The Defendant was third in pursuit, behind Deputy

Merson and Trooper Walker.  He testified he had "to drive over 110 miles an hour just to try to keep up and gain position into the pursuit."  Trial Tr. vol. 2, 13:7-8.  The Defendant did not see J.H.'s accident occur, but he saw an initial explosion and then a series of additional explosions which lit up the sky.  When the Defendant approached J.H.'s vehicle, he saw Deputy Merson use an ASP baton to break the glass of the driver's side window and then, officers other than the Defendant, pulled J.H. out of the car onto the ground.  The Defendant was shining his light on J.H. to look for his hands and make sure he did not have a weapon.  He did not see a weapon in J.H.'s hands, but he did not get a good look at J.H.'s waistline so he was unaware if there was a weapon at his waistline.

Once J.H. was on the ground, the Defendant remembered "seeing officers' lower halves because [he] was focusing entirely on what [he] perceived to be a potential threat at that point in time."  Id. at 20:17-19.  The Defendant testified "the subject ha[d] already shown a propensity to flee at a high rate of speed and endanger everybody else around him and ha[d] no regard – apparently no regard for the safety of others.  [He was] hearing commands of give me your hands, and he[] [was] just not complying."  Id. at 20:21-25.  J.H. was attempting to take his hands toward his waistline or tuck them underneath of him and the Defendant decided to holster his weapon to take the "lethal implement out of the situation."  Id. at 21:18-19.  While he was doing this he saw J.H. try to tuck his feet and he believed J.H. was going to try to stand.  The Defendant tried to kick J.H.'s legs out from under him.  While the Defendant kicked J.H., Deputy "Merson had dropped a knee back of the suspect's head apparently.  [The Defendant] believe[s] Walker [was] struggling with one of his hands.  [He] guess[es] that would be his right hand.  And appears that Ennis [was] looking for a way to get into the melee."  Id. at 23:9-12.  J.H.

was still trying to tuck his hands toward his waistline and the Defendant did not know if he was just keeping his hands away from the officers or if he was reaching for something in his waist.   J.H. was also still tucking his legs up towards his chest.   The Defendant characterized these actions as active resistance.

The Defendant reached down and grabbed one of J.H.'s feet to pull out from under him because J.H. kept trying to tuck his feet under him to stand up.   J.H. was actively resisting trying to pull his legs out from under him, causing the Defendant to deliver two or three compliance strikes with his foot.   The kicks were targeted in the nerve ending in J.H.'s knee to help deaden his leg and prevent him from pulling against the Defendant. While this was occurring, the Defendant heard other officers ordering J.H. to surrender his hands.   After the Defendant got J.H.'s leg out straight, he put his foot on J.H.'s buttock area and tried to pin his hips down to the ground so his legs would no longer be a threat to kicking at the Defendant.   Deputy Merson then removed himself from the situation due to back pain and the Defendant took over the side of the body where Deputy Merson had been.   He believed the situation was "trending towards being done."   Id. at 30:15-16.

Trooper Walker and Deputy Ennis were still with the suspect.   The Defendant left J.H. to check on Deputy Merson.   However, when the Defendant noticed Deputy Ennis was standing up, he looked to see if J.H. was handcuffed.   At this point, he noticed J.H. was cut on the side of his face.   He put a knee on J.H.'s back to prevent him from getting up if he was to become combative or resist again.   The Defendant believed Trooper Walker had control of J.H.'s hands and was handcuffing him.   However, J.H. had snuck his hand away from Trooper Walker and the Defendant heard Trooper Walker direct him to "stop or something to that effect."   Id. at 32:5-7.   J.H. was actively resisting again, so in

response the Defendant delivered a series of five right-handed, closed-hand compliance strikes targeting the muscle area of J.H.'s back.   The Defendant suspected J.H. was possibly intoxicated because in his experience suspects who are intoxicated tend to be combative or resistant, then they tire out and then become combative or resistant again in bursts.   After the compliance strikes, the Defendant noticed J.H. had broken his left hand free again so he helped Trooper Walker return J.H.'s left hand back to J.H.'s back so he could be handcuffed.   The Defendant could feel tension resistance[14] in J.H.'s hand and arm, which indicated he was either trying to pull his arm away or not allowing the officers to easily place his left hand in the small of his back.   In response to this resistance, the Defendant delivered three additional strikes.   While he was delivering the strikes, the Defendant shielded J.H.'s head because he did not want to punch him in the back of the head.   Finally, Trooper Walker was able to handcuff J.H.

Thereafter, Trooper Walker stood up with J.H. and the Defendant saw them both fall with their legs tangled.   The Defendant "assumed that [J.H.] had intentionally tripped Walker."   Id. at 37:20-21.   After the fall, J.H. was right next to Deputy Merson who was lying on the ground.   The Defendant testified he "view[ed] [J.H.] as an active combatant and decide[ed] [he] need[ed] to get him away from a possibly injured officer.   So [he] grabbed him up as quickly as [he could]."   Id. at 38:3-5.   The Defendant did not believe compliance strikes were working since J.H. was continuing to resist even after he was handcuffed.   He believed maybe he was too high or drunk for any compliance strikes to work so he attempted to try to break through another way by picking J.H. up by the front of his shirt and telling him he needed to stop fighting.   J.H. responded "by yelling

---

[14] The Defendant, Trooper Walker and Deputy Ennis all testified that it is hard to see what is characterized as passive resistance.  One can feel tensing up, but it is hard to see it.

something to the effect of like fuck you or something like that" and blood struck the Defendant's face.  Id. at 38:15-17.  The Defendant did not know if blood, spit or another liquid hit his face at the time.  When he felt something wet, he dropped J.H. on the ground, not realizing he likely dropped him harder than he intended.

The Defendant bent over J.H. and said "are you done now? Is this over?"  Id. at 39:13.  Then someone walked up and shined a light on J.H.  The Defendant realized there was blood all over J.H.'s face which is probably what the Defendant felt on his face.  The Defendant asked J.H. if he was finished fighting as he tried to pull up J.H.'s pants, which were down around his ankles.  He also checked J.H.'s pockets for weapons.  The Defendant testified "at this point, [he] now kn[e]w he's not going to run."  Id. at 39:22-23.  The Defendant moved J.H. again because one of the other deputies said they were going to move a little farther from the smoking vehicle.  J.H. was going to be transported to the hospital by ambulance because he had been in a pretty bad wreck and because any time force is used, the suspect is transported to the hospital by an ambulance.  Another deputy, who the Defendant cannot recall, helped him move J.H. closer to Route 11.  J.H. would not stand or walk so they had to carry him.  The Defendant and the other officer then sat J.H. down.  The Defendant testified J.H. was being belligerent towards him saying things that made him believe J.H. was on something.  J.H. was trying to sit up and the Defendant did not want him to become combative again so he grabbed him by the front of the shirt and pushed him back down to the ground, telling him he needed to stay on the ground. While the Defendant was telling J.H. he could have killed somebody, J.H. told the Defendant he did not care and "[s]tuff to that effect."  Id. at 42:5-6.  J.H. continued to try and sit up and the Defendant pulled J.H. close and told him he needed to stop.  At that

point, the Defendant delivered two fairly light left-handed, open-hand strikes to the right, uninjured side of J.H.'s face.  The Defendant specifically used his nondominant left hand on the uninjured side of J.H.'s face because he did not want to injure J.H.  The Defendant said he was just trying to gain J.H.'s compliance.

## II.  ANALYSIS

The statute under which the Defendant is charged provides, "[w]hoever, under color of any law . . . willfully subjects any person in any State . . . to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States . . . shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section . . . shall be fined under this title or imprisoned not more than ten years, or both."  18 U.S.C. § 242.

In order for the Court to find the Defendant guilty of an offense in violation of Section 242, the Court must find the Government proved, beyond a reasonable doubt, the Defendant (1) willfully (2) deprived J.H. of the right to be free from unreasonable seizure, which includes the right to be free from the use of unreasonable force (3) while acting in his official capacity as a West Virginia State Police trooper.  See United States v. Cowden, 882 F.3d 464, 474 (4th Cir. 2018).  A violation under Section 242 constitutes a felony offense if the Court finds the Government also proved, beyond a reasonable doubt, that the Defendant caused bodily injury to J.H.; otherwise, any violation is a misdemeanor offense.  See id. at 475.

The Government must prove each element of the charged offense beyond a reasonable doubt, including if bodily injury resulted from the Defendant's actions.  A

bench trial does not alter the Government's burden.  If this case had been presented to a jury, the Court would inform the jury to apply reasonable doubt according to its plain, ordinary, and every day meaning.  Federal courts do not provide juries further explanation of the meaning of reasonable doubt.  State court juries, however, are offered such explanation.  The Court offers such in this Order for illustrative purposes only as an explanation of reasonable doubt as this Court understands it and as applied to the facts as it found them in this case.

The Seventh Edition of the West Virginia Criminal Jury Instructions, Section 5.09 provides:

> The [Government] is not required to prove guilt beyond all possible doubt. The test is one of reasonable doubt.  A reasonable doubt is one based upon reason and common sense—the kind of doubt that would make a reasonable person hesitate to act.  Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that a reasonable person would not hesitate to rely and act upon it.

> [The finder of fact cannot convict the Defendant] on mere suspicion or conjecture.

> The burden is always upon the [Government] to prove guilt beyond a reasonable doubt.  This burden never shifts to a defendant, for the law never imposes upon a defendant in a criminal case the burden or duty of calling any witnesses or producing any evidence.

> So, if [the finder of fact], after careful and impartial consideration of all the evidence in the case, ha[s] a reasonable doubt that the defendant is guilty of the charge, [the finder of fact] must acquit.  If [the finder of fact] view[s] the evidence in the case as reasonably permitting either of two conclusions—one of innocence, the other of guilt—[the finder of fact] should adopt the conclusion of innocence.

The Seventh Edition of the West Virginia Criminal Jury Instructions, Section 5.09.

### A. Felony Offense

#### 1. Bodily Injury

If this case were presented to a jury, the jury would first determine if the Defendant was guilty of depriving J.H. of his rights, in violation of Section 242.  Only if the jury determined the Defendant was guilty would the jury then consider if the Defendant's actions resulted in bodily injury to J.H.  The Court will address the issue of bodily injury at the outset, because it is clear to the Court the Government did not prove, beyond a reasonable doubt, the Defendant's actions caused J.H. to suffer bodily injury.

The Fourth Circuit adopted the following definition of bodily injury: "(A) a cut, abrasion, bruise, burn, or disfigurement; (B) physical pain; (C) illness; (D) impairment of [a/the] function of a bodily member, organ or mental faculty; or (E) any other injury to the body, no matter how temporary."  See United States v. Perkins, 470 F.3d 150, 161 (4th Cir. 2006) (joining the First, Fifth and Eleventh Circuits by adopting the definition of bodily injury as set forth in 18 U.S.C. §§ 831(f)(5), 1365(g)(4), 1515(a)(5) and 1864(d)(2)).

Mr. Brown, the paramedic, testified J.H. had bleeding on the left side of his face and contusions on his left hip and left elbow.  He characterized these injuries as consistent with other patients he has seen in similar car accidents.  Mr. Brown also said J.H. complained of a headache, was frustrated he was handcuffed and complained his handcuffs were too tight.  Mr. Brown did not believe the handcuffs were too tight.  Further, when he asked about J.H.'s pain scale, J.H. stated he was not in any pain.

The testimony of witnesses consistently showed the bleeding on the left side of J.H.'s face was present prior to the Defendant coming into contact with J.H.'s face.  It is likely, based on the evidence presented, the headache and bleeding were caused from

the accident or being pulled out of the vehicle onto the ground.  The Government did not prove to the Court said injuries were exacerbated at all during the struggle, much less by the Defendant's use of force.  If any use of force might have exacerbated said injuries it could have been from force administered by Deputy Merson or Deputy Ennis's strikes.

The contusions on the left hip and left elbow were also likely from the accident or being pulled out of the vehicle onto the ground.  Trooper Walker testified J.H. was lying in between his left side and his stomach after being pulled onto the ground.  While circumstantial evidence can support a conviction beyond a reasonable doubt, the Government's burden has not been met for the Court to find beyond a reasonable doubt the contusion to the left hip and left elbow were caused by the Defendant's kicks.

J.H. was suffering from a headache when Mr. Brown arrived on the scene.  It is possible the headache was caused from the struggle of being handcuffed or the events themselves.  It is just as possible the headache was caused from J.H. crashing into a telephone pole at a speed in excess of 90 miles an hour without wearing a seatbelt. Several possible causes of J.H.'s headache led the Court to find the Government did not meet its burden to prove injury beyond a reasonable doubt.  Additionally, the handcuffs were confirmed by Mr. Brown to have plenty of room.

Finally, J.H. himself told Mr. Brown he was not experiencing any pain.  The Court did not hear testimony from J.H.  If J.H. had testified, he may have been able to offer evidence of his physical condition after the incident, including when and where he felt pain.  While J.H. could have felt some degree of pain during the Defendant's use of force, pain is the purpose of proper compliance strikes.  However, as more fully discussed below, the Court does not find the Defendant guilty of a misdemeanor offense in violation

of Section 242, and, therefore, pain experienced during proper pain compliance strikes does not make the Defendant guilty of a felony offense in violation of Section 242.

Additionally, the Court learned from testimony law enforcement protocol requires the suspect to be taken to the hospital for medical attention when there has been a use of force.  J.H. was transported from the scene by ambulance to the hospital.  However, the Government did not enter any medical records into evidence nor did any treatment provider from the hospital testify.  Such evidence may have conclusively proved or disproved whether J.H. sustained any injury or reported any pain from the use of force.

While any existence of bodily injury or physical pain could be enough to find bodily injury under the statute, the Court was not convinced beyond a reasonable doubt any bodily injury was due to the Defendant's unreasonable use of force. Therefore, failing to prove the element of bodily injury, the Government's burden on the felony offense has not been met.

### B. Misdemeanor Offense

#### 1. Color of Law

Next, the Court considers if the Government proved, beyond a reasonable doubt, the Defendant is guilty of a misdemeanor offense in violation of Section 242.

The Defendant does not contest that on November 19, 2018, during the incident in question, he was acting in his official capacity as a West Virginia State Police trooper. Accordingly, the Defendant was acting under color of law during the incident.

Therefore, the threshold question for the Court is whether the Defendant violated J.H.'s constitutional right to be free from unreasonable seizure, which includes the right to be free from the use of unreasonable force.   If the Defendant did violate J.H.'s

constitutional right, the next question is whether the Defendant acted with the specific intent to violate J.H.'s constitutional right.  "These two questions are logically, and legally, independent."  United States v. Reese, 2 F.3d 870, 884 (9th Cir. 1993).

### 2. Deprivation of Rights

For the Court to find the Defendant violated J.H.'s constitutional right, the Government must prove, beyond a reasonable doubt, that J.H. was deprived of his right to be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force.

The Fourth Amendment right to be free from unreasonable searches and seizures includes the right to be free of arrests effectuated by excessive force.  See Schultz v. Braga, 455 F.3d 470, 476 (4th Cir. 2006).  However,

> '[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' Johnson v. Glick, 481 F.2d, at 1033, violates the Fourth Amendment.  The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation.

Graham v. Connor, 490 U.S. 386, 396-97 (1989).

The standard for evaluating a use of force is one of objective reasonableness. "[T]he question is whether the officer['s] actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them."  Id. at 397.  This requires the Court to determine "whether a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force."  Elliott v. Leavitt, 99 F.3d 640, 642 (4th Cir. 1996).  "The 'reasonableness' of a particular use of force must be

judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

To determine if the force used was objectively reasonable, the Court must pay careful attention to the facts and circumstances, including the severity of the crime committed by J.H., whether J.H. posed an immediate threat to the safety of the officers or others, and whether J.H. was actively resisting arrest or attempting to evade arrest by flight and the extent of J.H.'s injuries. See id.; see also Hupp v. Cook, 931 F.3d 307, 321-22 (4th Cir. 2019).

While proceeding on a single count indictment, the Government presented the Court with evidence of four uses of force which it argues were unreasonable. The Court will address each use of force in turn.

### a. First Use of Force

The Defendant's first use of force was when he kicked J.H. and placed his foot on J.H.'s buttocks to hold him down. Based on the testimony and review of the dash camera video footage introduced into evidence, Trooper Walker, Deputy Merson and Deputy Ennis were all present when the Defendant first used force against J.H. Of the officers present during this use of force, Deputy Ennis and Deputy Merson also used physical force against J.H. Trooper Walker was focused on gaining control over J.H.'s hands to handcuff him. None of the other officers saw the Defendant's use of force because they were focused on their own actions.

J.H. had just rear-ended Deputy Merson's patrol car, fled the scene and then led the officers on an inherently dangerous high-speed chase, traveling over 90 miles an hour. The officers were using verbal commands to gain compliance, but the commands were ineffective and J.H. would not give up his hands or stop tensing up. J.H. had not

been checked for weapons at this point. Thus, he posed not only a flight risk, but also an immediate threat to the safety of the officers. He was actively resisting arrest by resisting being handcuffed and was attempting to tuck his legs under him which the Defendant believed was an attempt to stand up to flee again. The Defendant's kicks were in an effort to get J.H.'s legs out from under him and straighten them out. The Defendant was targeting the nerve ending in J.H.'s knee to help deaden his leg and prevent him from pulling against the Defendant. Once he was able to do so he put his foot down on J.H.'s buttocks to pin J.H.'s hips to the ground.

It is clear multiple officers on the scene felt the need to use force to control J.H. The struggle to control J.H. was so intense Deputy Merson had to remove himself from the situation after his use of force because he was experiencing back pain. Several times, Deputy Ennis had to step away to wind down from what he described as a pretty intense situation. Trooper Walker also had to remove himself from the intensity of the situation once J.H. was handcuffed. Considering the facts and circumstances from the perspective of a reasonable officer on the scene, the Defendant's use of force during the initial encounter was objectively reasonable. However, just because the Court finds that force was justified at this point in the encounter, does not mean force is justified later in the encounter if the justification for the initial force has been eliminated. See Meyers v. Baltimore County, Md., 713 F.3d 723, 733 (4th Cir. 2013).

### b. Second Use of Force

The Defendant's second use of force consisted of several closed-hand strikes to J.H.'s upper back. Only Trooper Walker and the Defendant were interacting with J.H. at this point. Deputy Merson, Deputy Ennis and Deputy Ritchie were all on the scene, but were not involved in this part of the encounter. The Defendant put a knee on J.H.'s back

to prevent him from getting up. Trooper Walker was trying to control J.H.'s hands to handcuff him, but J.H. kept pulling his hands away. When Trooper Walker placed J.H.'s hands in one of his to get his handcuffs out, J.H. broke Trooper Walker's grip and pulled his hands away. Trooper Walker had to yank J.H.'s hands back. J.H. continued to resist throughout this encounter. When J.H. tried to move his arms again, the Defendant delivered a series of five right-handed, closed-hand strikes targeting the muscle area of J.H.'s back. After the strikes, Trooper Walker was able to get J.H.'s right hand in handcuffs. Next, the Defendant adjusted J.H.'s left arm so Trooper Walker could get a hold of it. J.H. was still resisting trying to move his arms so the Defendant struck him three more times in the muscle area of his back. Trooper Walker testified the strikes delivered by the Defendant were compliance strikes.

Deputy Ennis testified when he saw the Defendant strike J.H., he walked back over to see if his assistance was needed. Deputy Ennis did not see J.H. resisting, but acknowledged if J.H. was tensing up he would not have been able to see it. Deputy Ennis did not see any apparent reason for the strikes, but noted because he was not engaged in the use of force, he could not say if the force was necessary or not. Deputy Ritchie was with Deputy Merson when he saw sudden movement from J.H. and then saw the Defendant deliver strikes to J.H. He did not see the second set of strikes delivered. Deputy Ennis and Deputy Ritchie did not believe their assistance was needed.

Because J.H. continued to resist being handcuffed and did not respond to verbal commands, the Court finds the strikes assisted Trooper Walker in gaining enough control to secure J.H.'s hands in the handcuffs. Moreover, Captain David Lee testified that closed-hand strikes could be used for pain compliance when he was asked about pain

28

compliance techniques.  J.H. had also still not been checked for weapons at this point in the encounter.  Accordingly, the Court finds the Defendant's strikes to J.H.'s upper back were objectively reasonable because a reasonable officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.

### c. Third Use of Force

The Defendant's next alleged use of force involved the Defendant picking J.H. up, carrying him to another location and dropping him on the ground.  Right before the Defendant moved J.H., the Defendant saw Trooper Walker attempt to move J.H. and fall to the ground.  The Defendant testified he believed J.H. intentionally tripped Trooper Walker and he wanted to move him so he would not be close to Deputy Merson who was lying on the ground experiencing back pain.  The Defendant testified after he moved J.H., J.H. responded yelling "fuck you or something like that" and the Defendant felt something hit his face.  Trial Tr. vol. 2, 38:15-17.  Therefore, the Defendant's reaction was to immediately drop J.H. to the ground.  The Defendant testified that in hindsight, it appeared he dropped him harder than he intended to at the time.

Deputy Ennis was walking along with the Defendant when he moved J.H.  Deputy Ennis testified he could understand why the Defendant moved J.H., but he could not say if there was a reason for the Defendant to move J.H. in the manner he did without speaking to the Defendant.  In follow-up to that response, the Government's counsel asked Deputy Ennis if he saw "any reason for Trooper Kennedy to toss the subject to the ground" and Deputy Ennis responded he "didn't see it, no."  Id. at 115:11-13.

Deputy Ritchie saw the Defendant pick up J.H., but did not see the Defendant toss J.H. to the ground.  Deputy Ritchie testified he did not see a reason for the Defendant to pick up J.H. in the manner he did, which was by the collar of his shirt.  Trooper Walker

did not see the Defendant move or use force against J.H. because he was upset at the time and had walked away from the situation.  Trooper Walker testified he felt the entire situation was tense and he was worried about his own safety and the safety of fellow officers.

While in hindsight the Defendant may have used more force than was necessary to create space between himself and J.H. and place J.H. on the ground, especially taking into consideration that J.H. was handcuffed behind his back, the Defendant's force was not unreasonable based on the facts and circumstances presented.  The Defendant admitted it appeared he dropped J.H. harder than he intended at the time.  The Defendant's "split-second judgment" to drop J.H. in the manner he did caused pause with the Court to consider the Defendant's actions.  The evidence regarding the third use of force permits two possible conclusions, one of innocence and one of guilt.  The Court must adopt the conclusion of innocence, because the Government has not met its burden of proving beyond a reasonable doubt the use of force rose to the level of unreasonable or excessive force.

### d. Fourth Use of Force

The final alleged unreasonable use of force arose from the Defendant slapping J.H. on the face.  The video evidence of this scene shows the Defendant by the snowbank with J.H., but the Court was unable to see what the Defendant was doing with his hands.  Thus, the Court can only rely upon the consistent testimony of the Defendant and eyewitnesses.

Before this interaction, the Defendant was able to check J.H. for weapons and no longer believed he was going to run.  Deputy Ritchie moved Merson farther away from

the smoking car.  The Defendant moved J.H. to a different area, as well.  The area was also where the ambulance was expected to arrive to pick up J.H.  J.H. kept trying to get up off the ground by raising his torso and the Defendant told him to stay down.  The Defendant also told him he could have killed Deputy Merson.  J.H. was continuing to try and raise his torso off the ground.  The Defendant pulled the Defendant close to him and told him to stop.  At the same time, the Defendant slapped J.H. in the face two times.  The Defendant used his left, nondominant open-hand to slap the right, uninjured side of J.H.'s face.  He was not using force to inflict injury.  The Defendant was trying to get J.H. to snap out of it and comply with his verbal commands.

Deputy Ennis had to help the Defendant carry J.H. to the waiting area because J.H. would not walk there on his own.  Deputy Ennis did not think anything of placing J.H. on the snow.  Deputy Ennis heard the Defendant say he could have hurt Deputy Merson in an angry, raised voice.  He also saw J.H. trying to raise his body off the ground in what looked to Deputy Ennis like an attempt to stand up.  Deputy Ennis saw a reason for the Defendant to use force.  Deputy Ennis testified he himself may have used less force, but he did not believe the light slap to J.H.'s face was excessive.  He did not feel the need to stop the Defendant or report the Defendant's actions to a higher authority.

Deputy Kolb testified he saw the Defendant's slaps from two or three feet away and he heard the Defendant tell J.H. he could have paralyzed Deputy Merson from the accident.  After the Defendant slapped J.H. in the face, Deputy Kolb saw blood on the Defendant's face and told the Defendant.  The Defendant wiped the blood off his face.  Deputy Kolb testified he did not see a reason for the Defendant to slap J.H. in the face.  Deputy Kolb acknowledged J.H. had tried to sit up several times against the Defendant's

verbal commands for him to stay down and stop resisting because an ambulance was on the way.  Deputy Kolb testified someone trying to get up like J.H. may try to escape or strike an officer, but he did not see it as a reason to use force.  Deputy Kolb did not believe J.H. was posing a threat or resisting, but he stated there absolutely was reason to believe J.H. might flee.  Deputy Kolb did not feel the Defendant's use of force was overboard.  If he did, he would have stepped in.

Neither officer who saw the Defendant slap J.H. in the face felt the force was "excessive" or "overboard."  Trial Tr. vol 1, 122:17-22, 60:12-16.  In fact, both officers stated they did not feel the need to step in.  The Court does not find the Defendant's light open-hand slaps to the uninjured side of J.H.'s face were objectively unreasonable.

A slow and methodical review of the dash camera footage and the testimony clearly show during each of the four uses of force every action by J.H. caused a reaction by the Defendant.  Considering the testimony and viewing the dash camera video footage of the incident played in a slowed and enhanced form, the Court cannot find beyond a reasonable doubt that any use of force by the Defendant was not objectively reasonable under the facts and circumstances presented to the Court.

### 3. Willfulness

Even if the Court were to find any of the four uses of force to be objectively unreasonable beyond a reasonable doubt, the Government did not prove, beyond a reasonable doubt, that Defendant acted willfully.  Specifically, the Government did not prove the Defendant acted with the specific intent to deprive J.H. of his right to be free from unreasonable seizures, which includes the right to be free from the use of unreasonable force by one acting under color of law.

A person acts willfully if he acts voluntarily and intentionally with the specific "intent to deprive a person of a right which has been made specific either by the express terms of the Constitution or laws of the United States or by decisions interpreting them." <u>Screws v. United States</u>, 325 U.S. 91, 104 (1945). It is not material whether the defendant was actually thinking in constitutional terms. <u>See</u> <u>id.</u> at 106. The defendant must have acted

> 'with the particular purpose of violating a protected right made definite by the rule of law or recklessly disregard[ed] the risk that [he] would do so.' <u>Mohr</u>, 318 F.3d at 619 (citation, internal quotation marks, and brackets omitted). Willfulness may be shown by circumstantial evidence, provided that the defendant's purpose reasonably may be inferred from all the connected circumstances. <u>Screws v. United States</u>, 325 U.S. 91, 106, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945) (citation omitted). '[T]he punitive intent behind a defendant's use of force may be inferred when the force is not reasonably related to a legitimate non-punitive governmental objective.' <u>See</u> <u>United States v. Cobb</u>, 905 F.2d 784, 789 (4th Cir. 1990) (citation and internal quotation marks omitted)."

<u>Cowden</u>, 882 F.3d at 474.

The Defendant testified he was frustrated with the situation. The Defendant was presented with a suspect who put officers and others in harm by leading them on a high-speed chase. J.H. would not listen to verbal commands and continued to tense up and move his hands when Trooper Walker was trying to handcuff him. Even after being handcuffed, J.H. continued to ignore verbal commands. However, the Defendant testified his frustration did not factor into the actions he took to gain J.H.'s compliance.

The Defendant still removed his weapon from the equation. The Defendant also shielded J.H.'s head when he delivered the strikes to J.H.'s upper back. He did this because he was aware J.H. was bleeding on the left side of his face and he wanted to ensure he did not hit him in the back of the head. The Defendant did admit to dropping J.H. likely harder than he intended to at the time, but this does not amount to willful action

to deprive J.H. of his constitutional right to be free from unreasonable force.  When the Defendant delivered slaps to J.H.'s face he used his left, nondominant hand, he used an open-hand rather than a closed-hand and he hit J.H. in the right side of his face, not the left injured side.  He was attempting to gain compliance, not injure J.H.  The Defendant's actions were not consistent with someone trying to inflict pain or do great harm to a suspect because they intend to deprive them of their right to be free from unreasonable force.  Contrast with United States v. Coté, 544 F.3d 88, 100 (2d Cir. 2008) (where "the nature of the force itself—repeatedly striking and kicking [the suspect] in the head—suggest[ed] that [the defendant] intended to injure him rather than simply restrain him."). The Government has not proven, beyond a reasonable doubt, the Defendant acted willfully.

### III.  CONCLUSION

Upon careful consideration, the Court finds the Government has not met its burden of proof beyond a reasonable doubt.  Therefore, the Court hereby **ORDERS** the Defendant be, and hereby is, **ACQUITTED** of the crime for which he is charged.  The Defendant is further discharged with any bond against him exonerated.  The charge against the Defendant is **DISMISSED WITH PREJUDICE**.

The Clerk is **DIRECTED** to transmit copies of this Order to all counsel of record herein.

**DATED**: December 23, 2019

GINA M. GROH
CHIEF UNITED STATES DISTRICT JUDGE